**PENN GALVANIZING COMPANY**

v.

**LUKENS STEEL COMPANY.**

**Civ. A. No. 71–820.**

United States District Court,
E. D. Pennsylvania.

March 12, 1973.

Joel C. Meredith, David Berger, P. A., Philadelphia, Pa., for plaintiff.

Edward W. Mullinix, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

NEWCOMER, District Judge.

Presently before the Court is the defendant's motion for Summary Judgment as to Count I of the Complaint. Count I of the Complaint attempts to allege an unlawful tie-in by the defendant, Lukens Steel Company, between the method of ultrasonically testing HY steel plates and the price charged by Lukens for such plates. Count I alleges that Lukens imposed, as a "condition" to its sales of such plates to Electric Boat, Division of General Dynamics, at Lukens' published prices, that Electric Boat agreed to accept a "static method" of testing. (See Plaintiff's Complaint ¶ 21.)

Count I also alleges that, "by reason of the foregoing conditions," Lukens has monopolized and attempted to monopolize the business of ultrasonically testing HY steel plates (Plaintiff's Complaint ¶ 22). Clearly, this so-called "tie-in" is the basis for Penn Galvanizing's monopolization charge since the tie-in is alleged to be the means by which Lukens monopolized and attempted to monopolize the testing market. (See Plaintiff's Memorandum in Support of Motion for Preliminary Injunction, p. 2.) The defendant, for the purposes of this motion only, has addressed itself solely to the tie-in theory, its premise being, that if the tie-in theory fails, there is no remaining basis for the monopolization allegation.

The basic facts on which Count I is based appear to be clear and not in dispute. Lukens is engaged in the business of manufacturing, selling, and ultrasonically testing HY–80 steel plates. (Plaintiff's Complaint ¶ ¶ 13 and 14.) Plaintiff, Penn Galvanizing Company, is also engaged in the business of ultrasonically testing HY–80 steel plates. (Plaintiff's Complaint ¶ 3.) Electric Boat, a Division of General Dynamics, is a shipbuilder engaged in the construction of nuclear submarines. (Plaintiff's Complaint ¶ 17.) HY–80 steel plates are used primarily in the construction of nuclear submarines, and Electric Boat is a substantial purchaser of such plates and a major purchaser of the ultrasonic testing of such plates. (Plaintiff's Complaint ¶¶ 3, 4, and 17.)

For the purposes of this case, there are two basic methods of ultrasonically

testing HY–80 steel plates: The static method and the scanning method. (Plaintiff's Complaint ¶ 8.) Both the static method and the scanning method of testing are performed by the same personnel with the same basic electronic equipment, and both Penn Galvanizing and Lukens are equally qualified, in terms of equipment and personnel, to perform either method of testing. (Plaintiff's Complaint ¶ 9; Notes of Testimony of the hearing held on June 14–15, 1971 on Plaintiff's Motion for Preliminary Injunction, p. 2–169.)

The scanning method of testing is more stringent than the static method. It inspects a larger area of a plate, may result in the discovery of a greater number of discontinuities in a plate, and thus may result in a higher rejection rate for plates so tested. (Plaintiff's Complaint ¶ 10; Exhibit D–1 with reference to the hearing of June 14–15, 1971; N.T. 1–164 to 1–167, and 2–166.)

The rate of rejection of plates due to testing is a direct component of Lukens' costs of manufacturing such plates. (N.T. 2–48 and 2–166.)

Lukens' costs of manufacturing HY–80 steel plates to meet the scanning method of testing are usually higher than its costs of manufacturing the same plates to meet the static method of testing. (N.T. 1–165 to 1–178 and 2–166.)

The price quoted by Lukens for HY–80 steel plates has varied from time to time with the stringency of the ultrasonic testing required by the purchaser, and Lukens has on occasion quoted Electric Boat a higher price for HY–80 steel plates if such plates were going to be required to meet the scanning method of testing. (N.T. 1–165 to 1–178.)

There is no dispute that Lukens has quoted a higher price for HY–80 steel plates if the plates are going to be required to meet a more stringent ultrasonic testing requirement than that to which Lukens' published price was geared. As The Honorable Alfred L. Luongo found in denying Penn Galvanizing's Motion for Preliminary Injunction, the Navy specification governing the manufacture and testing of HY–80 steel plates—MIL–S–16216G—provides for the static method of testing. (N.T. 2–165.) Lukens' price for such plates was geared to the rejection rate which could be expected when the static test was used.

For many years during the period in question, Electric Boat specified its own testing procedure. This procedure was set forth in Electric Boat Standard Shipyard Procedure 3.22 and was similar to the scanning method of testing required by the Navy specification for plates in excess of 2½ inches in thickness. (N.T. 2–167.)

In 1966, Lukens informed Electric Boat that, because of the significantly greater rejection rate experienced when HY–80 plates are tested to Procedure 3.-22, it would increase its prices for plates that were required to meet this more stringent testing procedure. (Exhibit D–1.) It is this price increase—or the price differential between plates ordered to the testing requirements by the Navy specification and those ordered to the more stringent requirements of Procedure 3.22—that serves as the basis for Penn Galvanizing's allegation of a tie-in. The complaint alleges that "defendant Lukens has unlawfully tied-in the ultrasonic *method of testing* to a lower, more favorable price for HY steel plates." (Plaintiff's Complaint ¶ 22, emphasis added.)

The defendant argues that Penn Galvanizing's tie-in theory is patently misconceived. The Supreme Court has indicated that a tie-in involves "an agreement by a [seller] to sell one product but only on the condition that the buyer also purchases a different (or tied) product." Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). The *defendant* argues that there is no such condition

alleged here. Quite simply, says the defendant, Penn Galvanizing has not alleged that Lukens conditioned the sale of its HY–80 steel on the buyer's purchase of the testing service from Lukens. On the contrary, Lukens' Vice President-Sales testified categorically at the preliminary hearing in June of 1971, that Lukens will and does sell HY–80 steel plates with or without ultrasonic testing to be performed by Lukens, and that such price which Lukens charges for the steel in no way depends on who does the ultrasonic testing (N.T. 2–9 to 2–10). This testimony was uncontradicted.

The defendant summarizes the basis for Penn Galvanizing's tie-in theory as follows: Lukens increased its price of HY–80 steel because the scanning method was specified by Electric Boat; this resulted in Electric Boat's abandoning the scanning method in favor of the less-stringent static method; and, since Penn Galvanizing will not test by means of the static method, it lost Electric Boat's testing business. The defendant argues that the fatal flaw in this theory is its failure to recognize that the price of the steel had no economic or competitive impact on the testing market. Which method of testing was required by Electric Boat had nothing whatsoever to do with who did the testing. Electric Boat's specification of the static method gave Lukens no competitive advantage in the market for Electric Boat's testing business. Penn Galvanizing has the equipment and personnel necessary to perform the static method and is fully able to compete with Lukens for Electric Boat's testing business. Thus, argues the defendant, there was no effect on competition between Penn Galvanizing and Lukens in the testing market (N.T. 1–89 to 1–90).

The facts tend to show that Lukens, in effect, charged a higher price for a higher quality of steel. The cost of producing plates for testing by the scanning method is greater than the cost of producing plates for testing by the static method, as Judge Luongo found in denying Penn Galvanizing's motion for preliminary injunction. (N.T. 2–166).

As Judge Van Dusen said, in his opinion for the Court of Appeals affirming Judge Luongo's denial of Penn Galvanizing's motion for preliminary injunction, Penn Galvanizing Company v. Lukens Steel Company, 468 F.2d 1021, 1023 (3rd Cir., 1972):

> "In regard to the anti-trust aspect of this case, we fail to see how Lukens' actions definitionally constituted a tie-in. Lukens was not offering to sell steel plate only on the condition that the purchaser also make use of Lukens' testing facilities. In any event, the district court's finding as to the reason for the higher price for steel to be scanned is supported by the evidence and suggests that Lukens' pricing policies quoted to Electric Boat did not violate the anti-trust laws."

The plaintiff has countered by arguing that the defendant wishes this Court to dismiss plaintiff's claim in Count I on the basis of the record before the Court in the preliminary injunction proceeding which was limited to the hurried discovery conducted by the plaintiff in connection with that proceeding. This discovery consisted of three depositions taken by plaintiff of what it thought were independent witnesses—employees of Electric Boat, Division of General Dynamics. However, the depositions revealed that all three deponents had met the day before with counsel for defendant, Lukens Steel Company, and discussed some of the matters about which they testified. (Painter Deposition, N. T. 152 to 153.) More importantly, defendant's motion is an attempt to have a final ruling on this case prior to full discovery on the issues involved. Plaintiff argues that many of the facts relevant to the issues of this case are in the control or knowledge of the defendant and not presently available to the plaintiff except through the procedures of discovery.

The plaintiff alleges that Penn Galvanizing Company is an independent ultrasonic tester of HY–80 steel plates, a specialized steel used in the construction of hulls of nuclear submarines. These plates range in size from approximately 3 feet x 2 feet to 35 feet x 15 feet and in weight from approximately one ton to 20 tons (N.T. 1–6). Moreover, HY–80 steel plates cost approximately three times more than regular steel plates (N.T. 1–104). Electric Boat, Division of General Dynamics, is a shipbuilder engaged in the construction of nuclear submarines and because it has no ultrasonic testing facilities of its own, it subcontracts its ultrasonic testing obligations to either the producing steel mill or to Penn Galvanizing. (Plaintiff's Complaint ¶ 17.) The defendant, Lukens Steel Company, is one of the two major producers of HY–80 steel plates, the other major producer being United States Steel Corporation. Armco Steel Corporation also manufactures limited sizes of HY–80 steel plates, but is not considered a principal producer. (N.T. 1–64.) Lukens also has ultrasonic testing facilities.

The quality specifications for HY–80 steel plates are published by the United States Department of Navy and these specifications set forth, inter alia, (1) the defects which if existing in a plate, make such plate unacceptable and (2) the various methods of ultrasonic testing which may be used to search for such defects. In setting forth the general background provisions for ultrasonic testing, specification MIL–S–16216G (SHIPS) expressly states in paragraph 10.2:

> "Background—Plate for submarine . . . requires control of quality beyond that commonly required for other structural application. These tests are intended to assure freedom from lamination, excessive segregation, and uniformity of heat treatment throughout the plate area."

For the purposes of this litigation, there are two methods of ultrasonically testing HY–80 steel plates, the static method and the scanning method. The "static" method consists of superimposing a 24-inch grid system on the steel plate and ultrasonically testing the plate at each intersecting point on the grid. (Plaintiff's Complaint, ¶ 8a.) "Scanning" method likewise superimposes a 24-inch grid on the plate, but the plate is tested by moving the transducer in a weaving pattern along the vertical and horizontal lines of each grid square and along one diagonal line within each square. Whereas the static method searches less than one per cent of the plate for defects, the scanning method searches more than 50% of the plate.

Penn Galvanizing is committed to using the scanning method of testing because, as its president, R. G. Perelman, testified at the preliminary injunction hearing: ". . . we have proven over the last ten years that the static test does not reveal the defects in the steel plate." (N.T. 1–65) and ". . . I will not test the material by the static method because I know it is not the proper method . . ." (N.T. 1–81).

On the other hand, Lukens feels that the static method is the maximum test required by the applicable Navy specifications and that if a plate is found to contain no defects after being static tested, it is an acceptable plate, even though the plate actually contains unacceptable defects which would be revealed by the scanning method of testing. N. T. 2–41, 2–58 to 2–60, and 2–61.)

Prior to 1966, Electric Boat required all the HY–80 steel it used in American nuclear submarines to be ultrasonically tested by the scanning method. Electric Boat called this provision Procedure 3.22 on their own specifications. As a result of Lukens' interpretation of the specifications, Lukens, commencing in 1966, took a course of action stating that if Electric Boat would continue to require

scanning, Lukens would charge a higher price for the steel than their published book price. At first, Lukens threatened to charge a 12–½% premium over its published price. (N.T. 1–171.) Electric Boat, in response thereto, adopted the static method as its requirement and dropped the requirement of scan testing. (Exhibit P–17.) In 1967, Electric Boat again required the scan test, whereupon Lukens refused to sell to Electric Boat if the scanning method was used. Lukens threatened a six per cent (6%) to six and one half per cent (6½%) premium over published price. (N.T. 1–176 to 1–177.) After that, Electric Boat again abolished the requirement of scanning and accepted the static method of ultrasonic testing. The plaintiff alleges that discovery to this date shows that at least in 1966, Electric Boat deleted the scanning method requirement against its will and with regrets. See memorandum from Electric Boat's chief Naval architect, H. Turner, dated April 6, 1966, which states in part:

"Electric Boat Division regrets the necessity to delete Shipyard Standard Procedure 3.22 [the "scanning" requirement] as a means for ultrasonic inspecting plate . . . ." (Exhibit P–17).

Mr. Wilkinson, in charge of Electric Boat's Quality Control Department, felt the same as Mr. Turner. (Wilkinson Deposition, pp. 103–104).

As a result of the pressure applied to Electric Boat by Lukens in the form of charging a higher price to Electric Boat if the plates were tested by the scanning method than Lukens would charge if tested by the static method, Electric Boat ceased requiring the use of the scanning method and, in fact, forbade its use. See affidavit of R. G. Perelman filed concurrently with plaintiff's memorandum in opposition to defendant's motion for summary judgment on Count I of the Complaint, which states that during 1972, Electric Boat rejected an offer by Penn Galvanizing to test by the static method and charge accordingly, but gratuitously and voluntarily to test by the scanning method and to report to Electric Boat if a plate passed the static test, but also to report any defects it found by scan testing.

As a result of Lukens' pressures on Electric Boat, the plaintiff, Penn Galvanizing, has gone out of the ultrasonic testing business. (See R. G. Perelman affidavit, ¶ 1.)

Count I of the plaintiff's complaint arises out of the aforedescribed set of circumstances. Count I alleges that Lukens has violated Section 1 of the Sherman Act by acting in unreasonable restraint of trade and has violated Section 2 of that Act by attempting to monopolize the ultrasonic testing market for HY–80 steel plates. Plaintiff argues that Lukens was able to perpetrate this violation because it was one of only two major producers of HY–80 steel.

Plaintiff alleges in Count I that Lukens "required as a condition for Electric Boat to purchase HY steel plates from Lukens at Lukens' published price that Electric Boat agree to use the static method of ultrasonic testing on such plates and if, on the other hand, Electric Boat requires that the scanning method of ultrasonic testing be used, the price from Lukens to Electric Boat for HY steel plates will be significantly greater than Lukens' published price." (Complaint, ¶ 21.) Count I then alleges that "because of the foregoing unlawful tie-in condition imposed by Lukens, Electric Boat . . . was forced by defendant Lukens to accept the static method of testing as a condition of being able to purchase from Lukens HY steel plates at Lukens' published fixed price." (Complaint, ¶ 23.) As a result of the foregoing tie-in condition and requirement plaintiff argues, Lukens unreasonably restrained trade and has monopolized the HY–80 Ultrasonic Testing market as it emanates from Electric Boat.

The plaintiff asserts that the defendant's motion for summary judgment

must be denied for the following reasons: (1) The motion was prematurely made prior to plaintiff's completing its pretrial discovery; (2) There are questions of fact which must be resolved; and (3) As a matter of law, the allegations of the complaint have alleged a violation of Sections 1 and 2 of the Sherman Act.

## DEFENDANT'S SUMMARY JUDGMENT MOTION IS PREMATURE AND UNTIMELY IN THAT PLAINTIFF HAS NOT COMPLETED ITS PRETRIAL DISCOVERY

As previously stated, the plaintiff to date has had very limited discovery. The plaintiff has taken no depositions of defendant and no depositions whatsoever except with respect to its preliminary injunction motion. In that respect, plaintiff took an abbreviated rushed deposition of three employees of Electric Boat, Messrs. Cowell, Painter and Wilkinson. The plaintiff has received answers to a portion of its first set of interrogatories; however, it has not completed even a substantial portion of its pretrial discovery.

■ It is error to grant summary judgment until a plaintiff has been given a reasonable opportunity to complete the discovery it seeks. Toebelman v. Missouri-Kansas Pipeline Co., 130 F.2d 1016, 1022 (3rd Cir., 1943); see also Garrett Biblical Institute v. American University, 82 U.S.App.D.C. 265, 163 F. 2d 265 (1947); Associated Hardware Supply Co. v. Big Wheel Distributing Co., 355 F.2d 114 (3rd Cir., 1966); Dietrich v. Standard Brands, Inc., 32 F.R.D. 325, 328 (E.D.Pa., 1953).

"The party opposing summary judgment must be given a reasonable opportunity to gain access to proof, particularly where the facts are largely within the knowledge or control of the opposing party." 6 Moore's Fed. Practice, ¶ 5615[5], p. 2397.

In the recent antitrust action of Harlem River Consumer Cooperative, Inc. v. Associated Grocers of Harlem, Inc., 53 F.R.D. 691 (S.D.N.Y., 1971), it was recognized that the absence of complete pretrial discovery renders a summary judgment motion premature. Moreover, summary judgment cannot be granted where material issues of fact remain unresolved. Sartor et al. v. Arkansas Natural Gas Corporation, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944); Hahn v. Bucyrus-Erie Co., 8 F.R.D. 315 (E.D. Pa., 1948). Particularly in antitrust litigation, the danger of premature dismissal by summary judgment is usually heightened by the complexity of the case. Philco Corporation v. Radio Corporation of America, 34 F.R.D. 453 (E.D.Pa., 1964).

■ In light of the fact that plaintiff has not completed its pretrial discovery, defendant's motion for summary judgment is premature.

## DEFENDANT'S MOTION IS IMPROPERLY BASED ON UNWARRANTED ASSUMPTIONS OF FACT AND THE FINDINGS ON THE MOTION FOR PRELIMINARY INJUNCTION; INDEED, MATERIAL QUESTIONS OF FACT REMAIN TO BE RESOLVED

In support of its motion for summary judgment, the defendant has assumed the validity of certain facts, which facts in actuality have not been resolved and are issues to be resolved at trial. These assumptions include, but are not limited to, the following:

Defendant states that

(i) "The rate of rejection of plates due to testing is a direct component of Lukens' costs of manufacturing such plates." (Defendant's Memorandum in Support of Motion for Summary Judgment, p. 3).

This assertion by Lukens may or may not be true. Moreover, depending on future discovery, it may or may not be relevant.

It is plaintiff's contention that under the specifications, plates, to be accepta-

ble, must be free of defects as defined in those specifications. Plaintiff further contends that it is defendant's obligation to manufacture plates without rejectable defects, as defined in those specifications, regardless of the testing method employed by the shipyard. Clearly this is an issue to be resolved by a jury. At the preliminary injunction hearing, defendant called as its witness Admiral Mason who testified that the Navy was satisfied with static testing. The plaintiff has had no discovery from other Navy personnel who may be much closer to the issue at hand than Admiral Mason. Moreover, in contrast to that testimony, Mr. Wilkinson of Electric Boat interpreted the specifications as not precluding scanning even though the static method might be permissible. (Wilkinson Deposition p. 89.)

Defendant states

(ii) "that it costs Lukens more to manufacture plates which pass the scanning test than those which pass the static test." (Defendant's Memorandum in Support of Motion for Summary Judgment, p. 4.)

This allegation again is a factual conclusion for which plaintiff has had no discovery. There has been no discovery of what Lukens' costs are. In fact, from 1966 through 1969, Lukens charged or threatened to charge premiums ranging from 6% to 12½% if the plates were scan tested. Plaintiff does not know what relation those premiums have to Lukens' costs or why the charge was 6% at one time and 12½% at another time. Those premiums may well turn out to be a penalty and greatly in excess of any manufacturing cost differential, if any. Plaintiff clearly is entitled to discovery on this factual issue.

Defendant states

(iii) "that the scanning test requires a more perfect plate than required by the specifications and that the specifications require

only the static method of testing." (Defendant's Memorandum in Support of Motion for Summary Judgment, p. 4.)

This again is a conclusion of fact for which plaintiff is entitled to, and has not yet had discovery.

 Moreover, in making this conclusory assumption, defendant relies upon findings of the district court in denying plaintiff's motion for a preliminary injunction. Such findings cannot be the basis for a motion for summary judgment. In Afran Transport Co. v. National Maritime Union, 175 F.Supp. 285, 287 (S.D.N.Y., 1959), the court held:

"The standards used to determine the motion for preliminary injunction were necessarily quite different from those which must be applied to the motion at bar. Plaintiffs' failure to make out the clear and convincing showing that would entitle them to a preliminary injunction is not in any way determinative of the present motion nor does it mean that there are no issues of fact to be tried. Indeed, if substantial issues of fact requiring a trial have been raised, this in itself is usually ground for denial of a motion for a preliminary injunction. Successfully resisting a motion for a preliminary injunction does not entitle a party to summary judgment without a trial. See Anderson-Friberg, Inc. v. Justin R. Clary & Son, Inc., D.C.S.D. N.Y., 98 F.Supp. 75, 83. See, also, Arnstein v. Porter, 2 Cir., 154 F.2d 464."

Accordingly, any findings by the District Court or the Court of Appeals which relate to the earlier preliminary injunction motion cannot be the basis for granting a summary judgment motion.

Defendant states

(iv) that the actions of Lukens had "no effect on competition between Penn Galvanizing and Lukens in the testing market."

(Defendant's Memorandum in Support of Motion for Summary Judgment, p. 6.)

This is a rather surprising statement by the defendant. There is no controversy that Lukens and Penn Galvanizing compete in the ultrasonic testing services market. There is no controversy that Lukens seeks to test the steel which it produces while Penn Galvanizing seeks to test that steel as an independent tester. Penn Galvanizing relies on the superior scanning method of testing. If Penn Galvanizing can perform that service at a price competitive with Lukens' performing the static test, Penn Galvanizing clearly has a competitive advantage over Lukens. Indeed, Mr. Wilkinson of Electric Boat agreed that from a quality control viewpoint and all other things being equal, Electric Boat would prefer the scanning test to the static test "because the scanning covers more area, and can determine and identify more defects." (Wilkinson Deposition, p. 91.) By precluding the scanning method from being used by charging a higher price for the steel if the scanning method is used, Lukens has removed a competitive factor which is important to Penn Galvanizing in the testing market. Moreover, Lukens cannot be permitted to force Penn Galvanizing (and Electric Boat) to lower its testing standards and to use a test which Penn Galvanizing believes to be inadequate in searching for defects. See F. T. C. v. Keppel & Bros., Inc., 291 U.S. 304, 312–313, 54 S.Ct. 423, 426, 78 L.Ed. 814 (1934). There the Court said:

"The argument that a method used by one competitor is not unfair if others may adopt it without any restriction of competition between them was rejected by this Court in Federal Trade Commission v. Winsted Hosiery Co., 258 U.S. 483, 42 S.Ct. 384, 66 L. Ed. 729, supra; compare Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 54 S.Ct. 315, ante, 78 L.Ed. 655. There it was specifically held that a trader may not by pursuing a dishonest practice, force his competitors to choose between its adoption or the loss of their trade. A method of competition which casts upon one's competitors the burden of the loss of business unless they will descend to a practice which they are under a powerful moral compulsion not to adopt, even though it is not criminal, was thought to involve the kind of unfairness at which the statute was aimed.

The practice in this case presents the same dilemma to competitors, and we can perceive no reason for distinguishing between the element of chance as employed here and the element of deception involved in labelling cotton goods "Natural Wool," as in the Winsted Hosiery Co. Case. It is true that the statute does not authorize regulation which has no purpose other than that of relieving merchants from troublesome competition or of censoring the morals of business men. But here the competitive method is shown to exploit consumers, children, who are unable to protect themselves. It employs a device whereby the amount of the return they receive from the expenditure of money is made to depend upon chance. Such devices have met with condemnation throughout the community. Without inquiring whether, as respondent contends, the criminal statutes imposing penalties on gambling, lotteries and the like, fail to reach this particular practice in most or any of the states, it is clear that the practice is of the sort which the common law and criminal statutes have long deemed contrary to public policy. For these reasons a large share of the industry holds out against the device, despite ensuing loss in trade, or bows reluctantly to what it brands unscrupulous. It would seem a gross perversion of the normal meaning of the word, which is the first criterion of statutory construction, to hold that the method is not "unfair". See Federal

Trade Commission v. Royal Mill. Co. supra (288 U.S. 212, 217, 53 S.Ct. 335, 77 L.Ed. 706, 709); Federal Trade Commission v. Algoma Lumber Co. supra (291 U.S. 67, 54 S.Ct. 315, ante, 78 L.Ed. 655)."

All of the foregoing raise questions of fact which are material to plaintiff's allegations in Count I and for which plaintiff is entitled to have, and has not yet had, pretrial discovery, including depositions of defendant's officers and employees and depositions of third parties, including the Navy.

In Traylor v. Black, Sivalls & Bryson, Inc., 189 F.2d 213, 216 (8th Cir., 1951), the Court laid down the following standard:

"A summary judgment is to be entered in a case if, but only if, the pleadings, depositions, and affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to a judgment as a matter of law. Rule 56(c), Federal Rules of Civil Procedure. A summary judgment upon motion therefor by a defendant in an action should never be entered except where the defendant is entitled to its allowance beyond all doubt. To warrant its entry the facts conceded by plaintiff, or demonstrated beyond reasonable question to exist, should show the right of the defendant to a judgment with such clarity as to leave no room for controversy, and they should show affirmatively that the plaintiff would not be entitled to recover under any discernible circumstances . . . . And all reasonable doubts touching the existence of a genuine issue as to a material fact must be resolved against the party moving for summary judgment."

In Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), the Supreme Court emphasized:

"We look at the record on summary judgment in the light most favorable to . . . the party opposing the motion, and conclude here that it should not have been granted. We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot."

In light of the foregoing, it is obvious that material questions of fact exist for which plaintiff has yet to complete discovery, and that these circumstances require the denial of Lukens' motion for summary judgment.

## PLAINTIFF HAS ALLEGED A VIOLATION OF SECTIONS 1 AND 2 OF THE SHERMAN ACT.

The defendant further premises its motion for summary judgment on the argument that plaintiff has not alleged a "tie-in" in violation of Section 1 of the Sherman Act. In making such argument, even assuming arguendo that it is correct, defendant has viewed Count I much too narrowly. For even if, again assuming arguendo, the allegations of Count I do not constitute a "classical tie-in" situation, they clearly allege an unreasonable restraint of trade (Section 1) and an attempt to monopolize (Section 2). The only effect of alleging a "classical tie-in" is that the plaintiff would establish a "per se" violation which would preclude Lukens from attempting to prove the "reasonableness" of its actions. See Northern Pacific Rwy. Co. v. U. S., 356 U.S. 1, 5–6, 78 S. Ct. 514, 518, 2 L.Ed.2d 545 (1958): "[Tying arrangements] are unreasonable in and of themselves . . ." So that even if plaintiff's allegations do not establish a "classical tie-in", they do, if proved, establish restraint of trade. Moreover, the plaintiff has the right to prove that such restraint was "unreasonable." Moreover, the issue of "unreasonableness" is clearly a question of fact which must be resolved at trial.

Moreover, even though the Court need not now decide this issue, the plaintiff has strongly asserted that the allegations of Count I do in fact establish an unlawful tying arrangement. The defendant's argument that no tie-in is established presumes that the tie-in must require the tied product to be purchased from the defendant. The defendant has cited no authority for this proposition. To the contrary, regardless of who is the provider of the tied product or service, a tie-in requirement still has the same undesirable competitive effects. Cf. United States v. Archer-Daniels-Midland Co. and Garnac Grain Co., Inc. (CH Trade Cases ¶ 73, 224 (E.D.La., 1970). In the case at bar, it clearly is. the defendant who seeks the benefit of and, in fact, realized the benefit of the tied product. As the Supreme Court held in United States v. Loew's, Incorporated [371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11]:

> " '[t]ying agreements serve hardly any purpose beyond the suppression of competition, . . . . They are an object of anti-trust concern for two reasons—they may force buyers into giving up the purchase of substitutes for the tied product . . ., and they may destroy the free access of competing suppliers to the tied product to the consuming market. . . . A tie-in contract may have one or both of these undesirable effects when the seller, by virtue of his position in the market for the tying product, has economic leverage sufficient to induce his customers to take the tied product along with the tying item. The standard of illegality is that the seller must have 'sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product.' "

In this case, as it presently stands before this Court, the meager discovery to date demonstrates that Lukens may have used its economic power to force its customer, Electric Boat, to give up unwillingly the scanning test and accept the static test. In the very least, this is an issue of fact to which plaintiff is entitled to discovery and a trial.

As the pleadings presently stand, one might argue that Lukens said to Electric Boat, "We really don't want to drive Penn Galvanizing out of the scanning test business; however, their testing is turning up too many of our defects, and we can't afford to have them around, so if you want to buy our steel, and scan test it, you are going to have to buy it at a prohibitively high price, or you are going to agree to buy it and static test it. But whatever way you cut it, we cannot afford the scanning test method." Perhaps when iron men went down to the sea in wooden ships, there was no problem involving a static method or a scanning method of testing. But the men of New Bedford have long since sailed into the great beyond, and now the iron men of New London go down to the sea in steel ships that sail under the surface of the mightiest oceans, and to them the best method of testing within a free and competitive market is vital. It is important to them, it is important to the Navy, and it is important to the nation.