The VENZIE CORPORATION, and F. M. Venzie & Company, Inc., Appellants,

v.

UNITED STATES MINERAL PRODUCTS COMPANY, INC. and William Armstrong & Sons, Inc., Appellees.

No. 74–1995.

United States Court of Appeals, Third Circuit.

Argued April 17, 1975.

Decided Aug. 27, 1975.

Peter Hearn, Murray S. Levin, Kenneth I. Levin, Philadelphia, Pa., for appellants; Pepper, Hamilton & Scheetz, Philadelphia, Pa., of counsel.

Benjamin M. Quigg, Jr., Stephen W. Armstrong, Philadelphia, Pa., for William Armstrong & Sons, Inc.; Morgan, Lewis & Bockius, Philadephia, Pa., of counsel.

Morris R. Brooke, Philadelphia, Pa., for United States Mineral Products Company, Inc.; Drinker, Biddle & Reath, Philadelphia, Pa., of counsel.

Before SEITZ, Chief Judge, and ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

Plaintiffs, the Venzie Corporation and F. M. Venzie & Company, Inc.[1], appeal from an order granting defendants' motion for judgment n. o. v. on their claim of a concerted refusal to deal. In their complaint, plaintiffs asserted that defendants United States Mineral Products Company, Inc. ("Mineral") and William Armstrong & Sons, Inc. ("Armstrong") had by agreement refused to sell a fireproofing material to plaintiffs in violation of Section 1 of the Sherman Act. Plaintiffs also attack an order of the district court directing a verdict for defendants on their claim that defendants had illegally tied the sale of the fireproofing product of Mineral to the purchase of the application services of Armstrong.

Plaintiffs and defendant Armstrong are competing fireproofing contractors in Philadelphia. In late 1969, plaintiffs were awarded contracts to fireproof two buildings in Philadelphia for which the general contractor was Turner Construction Company ("Turner"). Armstrong's bids on the projects were rejected. The contract for each job specified that asbestos spray fireproofing be used, and plaintiffs obtained permits from the City of Philadelphia conditioned upon their promise that there would be no visible emissions outside the building perimeters.

Shortly after plaintiffs began spraying on one of the projects, a civil suit was filed by the city Department of Health in March 1970 as a result of emissions of spray from the building. The suit was resolved by a stipulation that specified strict containment and clean-up procedures. Further violations of the city's Air Pollution Code through additional emissions led to the filing of a criminal suit against one of the plaintiffs by the Philadelphia District Attorney's office on June 23, 1970. After that plaintiff pleaded nolo contendere on July 21, 1970, to a charge of creating a public nuisance, an order was entered permitting further use of asbestos spray on the project only if the exterior walls of the building were first constructed. The order also required the substitution of a non-asbestos

---

1. Although plaintiffs are independent companies and in fact competing contractors, their interests in this case are identical. Therefore, we will refer to them collectively as plaintiffs throughout this opinion.

bearing spray as soon as such a product was approved for use.

Because Turner regarded erection of the exterior walls as unfeasible and because Turner rejected alternates to spray fireproofing such as gypsum hardboard or metal lath and plaster, plaintiffs began to search for a non-asbestos spray product to be used on both projects. The only asbestos-free spray product then on the market that met the fire retardation standards of the Philadelphia Building Code was Cafco DC/F. Developed by defendant Mineral in 1968–69, DC/F had been approved by Underwriters Laboratories, a national testing concern, for column, beam and deck fire retardation standards equivalent to those of the Philadelphia Code in March 1970.

Mineral sold its fireproofing only through licensees in order, according to Mineral, to insure high quality application. Although the company had given no exclusive territorial licenses and had previously licensed other Philadephia fireproofers, Armstrong was the sole Mineral licensee in Philadelphia in the summer of 1970.[2] A predecessor of both plaintiffs had been a Mineral licensee, but neither plaintiff had been authorized to apply Mineral fireproofing since a dispute between Mineral and the predecessor company in 1963.

Throughout the month of July 1970, plaintiffs and Turner bombarded defendants with requests to purchase DC/F for plaintiffs' use. The first contact was a July 6, 1970, telephone call by Turner's director of purchasing to Mineral's general sales manager. The Turner representative was told that Mineral would not sell to Turner and that Mineral had a Philadelphia licensee, but was also advised to contact Mineral's Philadelphia sales representative. The conversation was followed by a letter from Mineral describing DC/F in some detail and giving the telephone number of the Philadelphia representative who might be contacted for further information. In subsequent inquiries addressed to it during the month of July, Mineral maintained the posture that it sold only to its licensed applicators and that inquiries should be addressed to Armstrong. Plaintiffs' proposal to purchase DC/F from a Mineral licensee in New Jersey was met with a warning that Mineral would terminate shipments to that company if it found that the fireproofing materials were not being used directly by the licensee.

Armstrong's position regarding sales to plaintiffs was unequivocal throughout plaintiffs' negotiations. Around July 20, both the president and chairman of the board of Armstrong told plaintiffs that Armstrong could not sell DC/F because its franchise forbade resale of the product. Armstrong, in accord with the trade practice, had never sold fireproofing materials.

Once it was clear that plaintiffs could not obtain DC/F, Turner approached Armstrong for a bid on both projects, because the contractor felt this was the only way to obtain the product. Turner accepted one bid prepared on July 30 which contained percentages for overhead and profit described by one of its officials as "unusually high" and which gave a margin of profit greater than plaintiffs would have received under their contracts. A similar bid was later accepted for the second project. Plaintiffs' contracts were terminated.

Once Armstrong had submitted a bid to Turner, Mineral's Philadelphia representative visited the city on August 3, 11 and 18 for the purpose of obtaining final city approval for DC/F. Formal approval was granted on August 18, 1970, after it was determined that DC/F was suitable for the lightweight concrete Turner was using.

Plaintiffs filed this suit for losses incurred as a result of the termination of their contracts because of their inability to purchase DC/F. They alleged, *inter alia*, that defendants had violated Sec-

2. In September and October 1970, Mineral, under threat of antitrust suit, licensed two other Philadelphia contractors to handle its fireproofing.

tion 1 of the Sherman Act by: (1) engaging in a concerted refusal to sell DC/F to plaintiffs and (2) illegally tying the purchase of Armstrong's services to the purchase of Mineral's fireproofing.[3]

At the conclusion of plaintiffs' evidence, the district judge directed a verdict in favor of defendants on the tying claim. At the close of all the evidence, the court denied defendants' motion for a directed verdict on the refusal to deal claim and presented the case to the jury. In answer to special interrogatories the jury found (1) that defendants had engaged in a concerted refusal to deal with plaintiffs and (2) that plaintiffs had sustained combined damages of $112,134. The district court, however, entered judgment for defendants n. o. v. on the ground that "the reasonable inferences which the jury could draw are that there was no concerted refusal to deal . . . ." Even if the defendants had acted in concert, the court held there was no Sherman Act violation because "they were not motivated by the accomplishment of an anti-competitive objective nor was there any unreasonable restraint of trade." 382 F.Supp. 939, 955 (E.D.Pa.1974).

 Our function is to determine, if the district court erred in granting judgment n. o. v. In this task, we are required, as was the district court, to view the evidence and all reasonable inferences therefrom in the light most favorable to plaintiffs. Plaintiffs urge us to treat the directed verdict on the tying claim only if we sustain the judgment n. o. v. on the charge of a concerted refusal to deal.

### Evidence of Concerted Activity of Defendants

Plaintiffs urge that their inability to purchase Cafco was the product of two agreements between defendants: (1) a general restriction that Armstrong could not sell fireproofing which it purchased

from Mineral under its franchise contract except on an applied basis; and (2) a more recent agreement aimed at plaintiffs and supplementing the prohibition on resale under which Mineral also agreed not to sell to plaintiffs for the purpose of forcing plaintiffs from the Turner jobs so that defendant Armstrong could replace them.

With regard to these claims, although plaintiffs were not required to demonstrate the formation of any express agreement and although they could rely on an inference of the existence of an agreement from circumstantial evidence, they still had the burden of adducing sufficient evidence from which the jury could conclude, on the basis of reasonable inferences and not mere speculation, that defendants' refusals to deal with them were the product of concerted action between them. Assuming for the moment that Mineral had placed resale restrictions on Armstrong, we shall first treat the sufficiency of plaintiffs' evidence to establish that any resale limitation was supplemented by a concerted refusal to deal inspired by the anti-competitive motive of substituting Armstrong for plaintiffs on the Philadelphia projects.

### A. Agreement Not to Sell to Plaintiffs

Plaintiffs cite a number of items of evidence from which they argue the jury could reasonably have inferred the existence of a conspiracy between defendants to withhold DC/F from them in order that Armstrong might be substituted on the Turner jobs. We shall treat the items seriatim and then cumulatively.

In demonstrating the opportunities for creation of an agreement, plaintiffs point to the fact that numerous telephone calls were made between defendants in July and August 1970, that defendants admitted to a July 20th discussion concerning plaintiffs' inquiries to each of them, and that on July 21, 1970,

---

**3.** Plaintiffs also charged that defendants had conspired to monopolize and had monopolized the market for non-asbestos spray fireproofing in the Philadelphia area. They do not appeal from the resolution of those issues in defendants' favor.

officials of defendants met for lunch. Defendants explain the telephone calls and luncheon meeting as relating to a job at West Chester State Teachers' College where Armstrong was applying DC/F for the first time.[4] Although defendants denied that they had discussed plaintiffs or the Turner jobs except on July 20 and denied that any understanding was reached during that conversation, plaintiffs argue the jury could have disbelieved defendants and concluded that during the course of the telephone conversations and luncheon meeting, defendants reached an agreement not to sell to plaintiffs.

While the jury was free to disregard the defendants' testimony that no agreement of any kind was formulated during the course of these contacts, mere disbelief could not rise to the level of positive proof of agreement to sustain plaintiffs' burden of proving conspiracy. Furthermore, while proof of contacts between the manufacturer and its licensee during the crucial summer period may demonstrate an opportunity for formation of a conspiracy, such an opportunity is significant only if other evidence permits an inference that an agreement did in fact exist. Thus, it is necessary to review plaintiffs' other evidence before the importance of the contacts between defendants and the inferences the jury might legitimately draw therefrom may be determined.

In this regard, plaintiffs point to Armstrong's replies to their inquiries as indicating the existence of an agreement between defendants. On July 20, Armstrong's chairman advised Venzie to terminate its contract so that Armstrong could "finish it with the right product," and on July 21 he told Turner's general superintendent for one job that the only way Turner "could use [DC/F] was to have [Armstrong] take over the work on

a time-and-material basis." Armstrong made such statements even though Mineral had granted it no exclusive territorial license for the Philadelphia area. Plaintiffs urge that a permissible inference to be drawn from these expressions of confidence that Mineral would not permit any other company to apply DC/F was that Armstrong was relying on an agreement with Mineral that Mineral would not sell to plaintiffs.

However, the reasonableness of plaintiffs' inference from Armstrong's statements cannot be judged apart from the factual context in which the statements were made: Armstrong had been a Mineral fireproofing licensee for five years and was its only Philadelphia licensee at the time, plaintiffs were not Mineral licensees, and Mineral sold only to its licensees. Viewed in this context, we cannot see how from these statements the jury could do more than speculate that an agreement with Mineral to boycott plaintiffs may have given rise to Armstrong's assertions that it would be the only contractor in Philadelphia which could obtain DC/F. The inference that Armstrong's officials were relying on knowledge of Mineral's selling practices is so much stronger than an inference that they spoke with knowledge of an agreement not to sell to plaintiffs as to make it unreasonable to draw support for a theory of conspiracy from these statements.

Plaintiffs also seek support for their conspiracy theory from the eager assistance Mineral gave Armstrong in securing city approval for DC/F once Armstrong had bid on the Turner projects and from an assurance given Turner by Armstrong on July 30 that it could begin work in 5 days and would have enough DC/F to complete the first project. Plaintiffs argue that Armstrong's confidence about its supply of DC/F could only have been obtained from contact

---

4. Plaintiffs draw support for their conspiracy theory from the fact that there was testimony that one participant at the luncheon was an Armstrong official who had no connection with the West Chester job which was allegedly the subject of the meeting. That official later assumed direction of Armstrong's fireproofing on the Turner projects. We think it would be unwarranted speculation for the jury to attach any significance to the presence of this individual or to impute his status in August 1970 back to the date of the luncheon.

with Mineral and that the jury could have inferred that the defendants agreed then to go after the jobs aggressively and to inform Turner that work could begin in five days. They argue that all contacts between defendants and the visits by Mineral's Philadelphia representative to Philadelphia "must be viewed in light of this aggressive interest in the jobs." But even though there was contact between defendants at this time, this evidence proves nothing other than that Mineral acted in its own interests to obtain Philadelphia approval for its product after a licensee had submitted a bid on a major Philadelphia project and that it indicated the extent of supplies available for shipment to the licensee. The jury could not reasonably have inferred an agreement to boycott plaintiffs from such evidence nor could it have concluded that all Mineral's previous actions were colored by its willingness to assist Armstrong at this time.

Finally, plaintiffs rely to a substantial degree on what they describe as the "curiously evasive behavior" of Mineral in referring callers to Armstrong even though Armstrong was an applicator and not a seller of fireproofing. For example, on July 17, Mineral's Philadelphia representative told plaintiffs that Armstrong would "work something out or make it available to you." On July 20, Mineral's president emphasized to Turner the importance of using a franchised applicator in order that their products were properly applied so as not to damage their reputation and promised he would "personally exert pressure . . . to have Armstrong make some sort of arrangement with Venzie." Plaintiffs argue that from this language the jury could have inferred that Mineral could not deal without Armstrong's permission. Otherwise, they say, it would have been much simpler for Mineral to sell directly to plaintiffs rather than referring the caller to Armstrong.

These statements must also be judged in their context. Since Mineral traditionally sold only to its licensees, we find nothing inconsistent in its refusal to sell and the referral of callers to a licensee which could sell the product on an applied basis. However, Mineral's apparent willingness that Armstrong "make [DC/F] available" does appear inconsistent with its arguments respecting the need for application by its trained licensees. The question then becomes whether this inconsistency was sufficient to justify the jury in finding conspiracy.

■ We must conclude that this inconsistency, even when viewed in light of the other evidence to which plaintiffs point, is insufficient to meet their burden of proving conspiracy. Apart from evidence that each defendant refused to deal with them and that at least by the time of the telephone conversation between defendants on July 20 each was aware of the other's actions, plaintiffs relied on the circumstantial evidence outlined above as proof of agreement. Their evidence does not, however, include two elements generally considered critical in establishing conspiracy from evidence of parallel business behavior: (1) a showing of acts by defendants in contradiction of their own economic interests, *Delaware Valley Marine Supply Co. v. American Tobacco Co.,* 297 F.2d 199 (3rd Cir. 1961), *cert. denied,* 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962); and (2) satisfactory demonstration of a motivation to enter an agreement, *First Nat'l Bank v. Cities Service Co.,* 391 U.S. 253, 287, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

The absence of action contrary to one's economic interests renders consciously parallel business behavior "meaningless, and in no way indicates agreement. . . ." Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal,* 75 Harv.L.Rev. 655, 681 (1962). In this case, Armstrong's refusal to sell was wholly consistent with its history as an applicator and not a seller of fireproofing and was in line with the trade practice as testified to by plaintiffs' witnesses. Furthermore, although Mineral's refusal to deal meant that it bypassed the opportunity to make substantial sales to

a non-licensee, such action was consistent with its history of insuring proper application of its products by selling only through trained licensee-applicators.

Critical also is a showing of a motivation to conspire against plaintiffs, for in the absence of a demonstration of how it would benefit a party to refuse to deal, the requisite inference of conspiracy does not follow from a mere coincidence of refusals to deal. *First Nat'l Bank, supra.* Plaintiffs find evidence from which motivation may be inferred in the fact that under its 1965 license agreement with Mineral, Armstrong was committed to purchase all its requirements of machine applied fireproofing from Mineral. Although the agreement contained no limitations on Mineral's Philadelphia sales, plaintiffs argue that the jury could have inferred that as a quid pro quo for the requirements provision, Mineral had agreed to sell to applicators in Philadelphia only with the concurrence of Armstrong.

The record contains no evidence other than the requirements contract itself from which the jury could infer the existence of any agreement giving Armstrong general veto power over Mineral's Philadelphia sales. The absence of any other evidence pointing to such an agreement convinces us that the jury could not reasonably have found such an agreement to exist and could not have concluded that Armstrong exercised a veto power over sales to plaintiffs pursuant to a pre-existing commitment by Mineral. Furthermore, this case was tried on the theory that defendants entered a specific conspiracy in reaction to certain events in the summer of 1970 with a definite purpose: "to gain the [Turner] jobs for Armstrong." Plaintiffs do not suggest any way in which the requirements contract might have motivated Mineral to enter such an agreement to oust plaintiffs, and no connection is apparent to us.

Plaintiffs' failure to demonstrate a benefit that would motivate Mineral to agree to refuse to deal with plaintiffs is underscored by the absence of evidence from which the jury could reasonably have inferred that there was such a substantial possibility that Armstrong would obtain the Turner jobs if plaintiffs could not purchase DC/F that Mineral would decline definite sales to plaintiffs in the hope of securing such a result. Although plaintiffs testified that they conveyed their "predicament" to Mineral as early as July 17, and although defendants were aware of the city's crackdown on asbestos spray products, nothing in the record demonstrates that either defendant was or should have been aware that DC/F was the only product that Turner could or would use on the projects. Indeed, internal Turner memoranda show that as late as July 24, Turner made a tentative decision to recommence work on one building with a combination of plaster and another asbestos-free spray that met the Philadelphia fire standards except for columns. Turner's decision to use only DC/F was not made until some time after that date. The viability of such a combination as an alternative to DC/F is demonstrated by the fact that the columns on the other building were in fact fireproofed with a plaster compound. Furthermore, Turner had made contacts pointing to purchase of the alternate spray until it appeared that there was some question whether the product had been tested on the type of concrete Turner was using and whether the product must be tamped after application. Even after Turner settled on DC/F, tests for its effectiveness on the particular concrete had to be conducted before it was approved for use.

In sum, plaintiffs established parallel refusals to deal, contacts between a manufacturer and its licensee during the crucial time period, confidence by Armstrong that it alone would be able to secure DC/F, Mineral's active assistance to Armstrong once the latter had submitted a bid to Turner, and Mineral's seemingly inconsistent behavior in hinting that Armstrong might make DC/F available to plaintiffs. However, they failed to prove any conduct contrary to Mineral's economic interests and do not point to any factors which would moti-

vate Mineral to agree in 1970 to refuse to sell to plaintiffs. Giving plaintiffs every legitimate inference in their favor from the evidence, we must conclude that they failed to adduce sufficient facts from which the jury could reasonably have inferred the existence of an agreement under which Mineral bound itself not to sell to plaintiffs in order to force them from the Turner jobs. We find the evidence was insufficient to permit the jury to reject the conclusion that Mineral's refusals of plaintiff's offers to purchase were the result of independent business judgment exercised consistently with its economic interests.

### B. Resale Restrictions on Armstrong

Plaintiffs also urge that resale restrictions were imposed upon Armstrong by Mineral, and that such restrictions themselves constituted per se violations of Section 1 of the Sherman Act. They rely for support on the statement in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 379, 87 S.Ct. 1856, 1865, 18 L.Ed.2d 1249 (1967) that "it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it." They argue that Mineral's warning that it would terminate sales to a New Jersey licensee if that company resold to plaintiffs demonstrates that Mineral would act to enforce such an unlawful restriction on resales.

Armstrong's license agreement with Mineral contains no prohibition on resale. However, in refusing to sell DC/F to plaintiffs, officials of Armstrong twice stated that its franchise forbade resale of Mineral's fireproofing. Despite the absence of a written resale restriction, we agree with plaintiffs that this evidence would justify the jury in concluding that a ban on resales by Armstrong did in fact exist by agreement between defendants.

That the jury may have found such an agreement to exist does not, however, mean that antitrust liability must inevitably follow. This court, sitting in banc,

has previously limited the language of *Schwinn* relied on by plaintiffs to its factual context of restrictions on resales by bicycle distributors. *Tripoli Co. v. Wella Corp.*, 425 F.2d 932 (3rd Cir. 1970), *cert. denied*, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1971). Furthermore, we are mindful of the Supreme Court's admonition in *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963) that it is necessary to assess the actual impact of vertical restrictions on competition before deciding whether they have such a "pernicious effect on competition and lack . . . any redeeming virtue" that they should be classified as per se violations of Section 1 of the Sherman Act.

The nature of the business of defendant Armstrong and its competitors is most persuasive that any restrictions on its resale of fireproofing had no anticompetitive effect that could give rise to per se antitrust liability. The record makes it clear that contractors such as Armstrong are consumers, not distributors, of fireproofing products which they purchase for use in connection with the sale of their application services. Plaintiffs do not dispute that Armstrong has never sold fireproofing since it entered the field in 1950. More significantly, even the president of Venzie attested to the fact that the trade practice among fireproofing contractors is that no one, including plaintiffs, engages in reselling fireproofing, although loans of material are sometimes made "to help out competitors if they are short."

We are unable to discern how Mineral's attempt to limit Armstrong to acting as an applicator and not a seller of its fireproofing could unreasonably restrain competition when in fact there is no competition among fireproofing contractors in the resale of fireproofing materials. We are not here concerned with restrictions on sales by distributors or retailers in the business of selling, and thus find *Schwinn* inapplicable to this fact situation.

Since we have found that the evidence was insufficient for a reasonable jury to

conclude that defendants' refusals to deal with plaintiffs were the product of an agreement not to sell to plaintiffs and that any general restrictions on re-sales by Armstrong did not violate the Sherman Act, we must conclude that the district court properly entered judgment n. o. v. for defendants on plaintiffs' conspiracy claim. Because of our disposition of the issue of agreement between defendants, we need not reach plaintiffs' arguments respecting definition of the relevant product market.

*Unlawful Tying Arrangement*

■ Because we have concluded that the district court did not err in granting judgment n. o. v., it is necessary that we treat plaintiffs' claim that error was committed when the court directed a verdict for defendants on their charge of an illegal tie-in. In this aspect of their case, plaintiffs argue that Mineral's policy of selling only to licensed applicators who in turn sold only on an applied basis amounted to a tying arrangement under which the purchase of DC/F was permitted only if Armstrong's application services were also bought.

■ The Supreme Court has defined a tying arrangement as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pacific Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Such agreements are unlawful where the tying product possesses sufficient economic power so as to appreciably restrain competition in the tied product market and a "not insubstantial" amount of commerce is affected by the arrangement. *Id.* at 6, 78 S.Ct. 514. Tie-ins are treated as per se antitrust violations because they serve no purpose other than the suppression of competition. *Id.*

The critical deficiency in plaintiffs' efforts to prove an illegal tie-in is that they have failed to establish a factual pattern that falls within the definition of arrangements which the Supreme Court has declared illegal per se. Mineral did not offer to sell to plaintiffs conditioned on their use of Armstrong's services as an applicator; Mineral refused to sell to plaintiffs under any circumstances since they were not licensees. Mineral's response was a refusal to deal, not a conditioned agreement to deal. In adopting such a position, which plaintiffs do not here urge was the product of any agreement with Armstrong, Mineral was merely exercising its right protected under the doctrine of *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), to refuse unilaterally to deal with any present or potential customer.

Furthermore, plaintiffs have cited us to no tie-in case in which, as here, the seller of the "tying" product had no economic interest in the market for the "tied" product or was not at least receiving a commission on sales of the product.[5] Our research has revealed only cases holding to the contrary. *See, e. g., Crawford Transport Co. v. Chrysler Corp.,* 338 F.2d 934 (6th Cir. 1964), *cert. denied,* 380 U.S. 954, 85 S.Ct. 1088, 13 L.Ed.2d 972 (1965); *Miller Motors Inc. v. Ford Motor Co.,* 252 F.2d 441 (4th Cir. 1957). The record in this case fails to establish any effort by Mineral to use its economic position as the manufacturer of DC/F to invade and dominate the fireproofing application business and does not demonstrate any interest of Mineral in Armstrong except to insure proper application of its products when purchased by others. The absence of a direct interest in the tied product market leaves open the possibility of a nonpredatory justification for requiring sales only

---

5. The case cited by plaintiffs for the proposition that "regardless of who is the provider of the tied product or service, a tie-in requirement still has the same undesirable competitive effects," *Penn Galvinizing Co. v. Lukens Steel Co.,* 59 F.R.D. 74, 84 (E.D.Pa.1973), involved a seller of the tying product who also sold the tied services and used its leverage over the price of the tying product to force the purchaser to forego use of a competitor's service.

through Armstrong and distinguishes this situation from the solely anti-competitive arrangements which have been branded as per se antitrust violations.

To adopt plaintiffs' position would revolutionize the antitrust field. Every refusal by a franchisor to deal with one not a franchisee would automatically lead to a per se violation of the Sherman Act if the franchisor's product possessed the "desirability to consumers" or "uniqueness" which have been found sufficient to establish the necessary economic power of the tying product. *United States v. Loew's, Inc.,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). It would, moreover, amount to a substantial undercutting of the *Colgate* doctrine validating unilateral refusals to deal in the absence of a monopolistic purpose. Neither precedent nor policy suggests that such a reordering of the antitrust implications of business behavior is in order. The district court did not err in directing a verdict for defendants on plaintiffs' tying claim.

The judgment of the district court will be affirmed.