Jack WEIT, James B. Cox and Robert W. McLallen, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, a corporation, Harris Trust and Savings Bank, a corporation, Pullman Bank and Trust Company, a corporation, Central National Bank in Chicago, a corporation, American National Bank and Trust Company of Chicago, a corporation, all other Illinois banks similarly situated, and Midwest Bank Card System, Inc., a corporation, Defendants.

No. 70C1926.

United States District Court,
N. D. Illinois, E. D.

Dec. 22, 1978.

Herbert J. Bell, pro se.

Arnold I. Shure, Chicago, Ill., for H. James Rosenberg.

C. D. Kasson, Hinsdale, Ill., Burditt & Calkins, Chicago, Ill., for John T. Jenos.

James E. Beckley, A Professional Corp., Chicago, Ill., for plaintiffs.

Francis A. Beninati, Chicago, Ill., John P. Meyer, Danville, Ill., Jeffrey Jahns, Jon R. Waltz, Dennis C. Waldon, William T. Huyck, Roan & Grossman, William R. Warnock, Chicago, Ill., for plaintiffs.

Jerald P. Esrick, Max Wildman, Wildman, Harold, Allen & Dixon, Chicago, Ill., for Pullman Bank and Trust Co., a corporation.

Bryson P. Burnham, John D. Donlevy, Bertram M. Long, Mayer, Brown & Platt, Chicago, Ill., for Continental Illinois Nat. Bank and Trust Co. of Chicago, a corporation.

Winston & Strawn, Demetri J. Retson, Chicago, Ill., for Central Nat. Bank in Chicago, a corporation.

Kirkland & Ellis, Carl S. Lloyd, Chicago, Ill., for American Nat. Bank and Trust Co. of Chicago, a corporation and all other Illinois banks similarly situated.

Christine H. Rosso, Chapman & Cutler, Keehn Landis, Chicago, Ill., for Harris Trust and Savings Bank, a corporation.

George W. Groble, pro se.

### Memorandum

LEIGHTON, District Judge.

This is a class action brought by three charge cardholders in the Midwest Bank Card System, Inc., and its successor, the Interbank-Master Charge Bank Card System, Inc., against five Chicago banks[1] for alleged violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. The gist of the claim is that defendants conspired to fix the rate of interest charged for extended payment privileges on credit card purchases at 1.5% per month, or 18% annually.

Counts I and II of the third amended complaint allege that defendants engaged in a horizontal conspiracy. Counts III and IV repeat the allegations of the first two counts and further allege several vertical conspiracies among defendants and their correspondent banks.[2] The class was certified on Counts I through IV by another judge of this court and consists of plaintiffs and all persons and business entities issued a bank credit card with a billing address in Illinois, which persons or business entities held an active Midwest Bank Card System, Inc. or Interbank-Master Charge, Inc. bank credit card account during the August, 1970 billing cycle, and who have incurred finance charges. *See Weit v. Continental Illinois Nat. Bank & T. Co. of Chicago*, 60 F.R.D. 5 (N.D.Ill.1973).

Plaintiffs seek one hundred million dollars in damages before trebling and an injunction requiring renegotiation of cardholder interest rates on an individual basis. Their suit has been pending for more than eight years, during which time the parties have conducted thorough and far-ranging discovery. The cause is before the court on motions by defendants Continental, Harris, and American for summary judgment as to the charges of horizontal conspiracy alleged in Counts I through IV and a motion by Continental for summary judgment as to the vertical conspiracy alleged in Counts III and IV. For the following reasons, the motions are granted.

### I.

The historical facts, as drawn from the pleadings, depositions, affidavits, answers to interrogatories, and numerous documents produced in the course of discovery, are undisputed.

---

1. Continental Illinois National Bank and Trust Company of Chicago, Harris Trust and Savings Bank, Pullman Bank and Trust Company, Central National Bank in Chicago, American National Bank and Trust Company of Chicago, and the Midwest Bank Card System, Inc. The Midwest Bank Card System, Inc. is a not-for-profit corporation established to administer the compatible bank charge card system under

which the defendants issued their credit cards. It has never been served with process. A description of the system can be found in the Appendix.

2. Counts V and VI have been disposed by grants of summary judgment in defendants' favor. Decisions, July 14, 1976 and December 27, 1976 (McMillen, J.).

A. Formation of the Midwest Bank Card System

The idea of a regional, compatible bank charge card with a common identification mark, uniform sales slips, and a system for clearing or transferring them between banks, originated with First National Bank of Chicago [3] in late 1965. In early 1966, First hosted a meeting attended by representatives of Continental, Harris and Northern Trust [4] to discuss the feasibility of a card program. The proposal was well-received; and in May, 1966, the group began to hold regular meetings in order to work out the details of the system. A representative of American attended these meetings as an observer. The minutes of the May 22, 1966 meeting, attended by representatives of First, Harris and Northern, summarize a discussion about the maximum legal interest rate:

> Lewis [of Harris] commented that the maximum must be no more than the equivalent of 7% add-on per annum or less than 14%. Foote [of Harris], who said he had looked into credit cards on his own for Harris some months ago, found specific revolving credit enabling legislation in other states where 1½% per month is in effect. Wood [of First] commented that this is troubling First's lawyers, too.

The minutes of the May 26, 1966 meeting, attended by representatives of the same three banks, state that "Wood [of First] said the First's lawyers had two legal questions—rate and antitrust—and the antitrust seemed to be the easier of the two."

At these early meetings, the group determined that card design, imprinter and forms could be uniform, and that a participating merchant directory, a list of cancelled or stolen cards, and a merchant instruction booklet could be jointly issued. However, on advice of counsel, it was agreed that advertising and market research, other than necessary system research, could not be done jointly. Defendants were aware of potential antitrust liability; and various documents indicate they knew interest rates were not to be discussed.

In July, 1966, for assistance in working out the program, the group retained Information Sciences Associates of Cherry Hill, New Jersey, a consulting firm with experience in the formation of charge card systems. First, Continental, Harris and Northern consulted Wells Fargo Bank of California about the mechanics of its participation in the Western Bank Card Association. They also met with representatives of the BankAmericard Service Corporation concerning its operational procedures. In August, 1966, some group representatives met with officers of the Marine Midland Bank to discuss the possibility of creating a national bank charge card system. Members of the group also met several times in August with representatives of Pullman Bank and Trust Company [5] which was planning its own separate charge card program, Illinois Bank Charge.

Various internal bank memoranda express concern over the timing of introduction of the service. A Continental internal memorandum of August 11, 1966 states: "Three month lead over competitor would be advantageous. [Valley National Bank of Phoenix, Arizona] believe[s] that if anyone goes in Chicago, others will and this may result in chaos in the market. Could be disastrous [sic] . . .. From the standpoint of competition, the longer Continental waits the less advantage it has. The more opportunity [other banks have] to study the program, the more opportunity there is for every bank in the city to become a full-fledged card issuer and mer-

---

3. First is named as a non-defendant co-conspirator in Counts I and III of the third amended complaint. Although First was a founding member of the Midwest Bank Card System, it left Midwest and joined BankAmericard, a competing compatible card system, in January, 1970.

4. Although Northern participated in the initial planning sessions, it dropped out of the program in August, 1966, prior to the formation of the Midwest Bank Card System, Inc.

5. Pullman was a correspondent of First, Harris and Continental.

chant solicitor, which dilutes the market extensively." A Harris internal memorandum of December, 1966 likewise concluded that

For many months, prior to last May, all of us had been reading of the increasing interest in bank credit card plans throughout the country and most of us concluded, I think, that it would be very difficult for any one bank in Chicago to successfully operate a broad credit card plan in our area because of our unit banking system. And, even if it tried, others would soon initiate similar and competitive plans resulting in a chaotic state of affairs as far as the public and the merchants were concerned. In May, therefore, representatives from the Continental, First National, Northern, and ourselves met for the first time to discuss the feasibility of devising a system that would enable any and all banks in the Chicago Metropolitan Area and in the State of Illinois to operate a charge card plan on a compatible and competitive basis.

Obviously such a system to insure prompt interchange of sales slips between banks had to include a uniform type credit card with a common identification mark or logogram, a uniform sales slip for merchant use, a standard type machine for functioning the sales slips, and finally the key to the whole compatible system—a method of clearing or transferring slips between banks.

The group originally planned to open membership to all Chicago area banks and each member bank was to be free to set its own terms on which it would do business with its cardholding customers and its merchants. Outlines of the system prepared for distribution to their correspondents by Continental and Harris in August, 1966 state:

It must be emphasized that nothing in this system is intended to restrict competition among banks with respect to any facet of the charge card business. It is apparent, however, that the mechanical problems involved in the presenting and paying of sales slips must be solved by the development of a uniform system for handling sales slips in order that the convenience of a charge card service can be made available to the largest possible segment of the people at the lowest possible cost.

During the summer, David M. Kennedy, Continental's chairman of the board of directors, determined that its Town and Country charge card should carry the highest interest rate legally permissible so as to make the system, for which Continental projected early high losses, profitable as soon as possible. On October 3, 1966, before issuing the cards, Continental applied to the Comptroller of the Currency on its own behalf seeking confirmation of its interpretation of the Consumer Finance and Consumer Installment Loan Acts, Ill.Rev.Stat. ch. 74, §§ 19–46, 51–77 (1965), and Comptroller's Ruling No. 7310 which, taken together, suggested that a rate of 1.5% per month would be the maximum overall effective rate within the statutory allowance applicable to national banks. The reply of Robert Bloom, Chief Counsel of the Comptroller of the Currency, confirmed Continental's interpretation of Ruling No. 7310. All of Continental's officers and executives stated in their deposition testimony that interest rates were never discussed with representatives of other defendant banks; all said that the interest rate policy was independently formulated and implemented.

Similarly, Carroll E. Prater, Harris' senior vice-president, stated that Harris, too, determined to charge the maximum legal rate for extended payment privileges:

[B]efore we had ever gotten into this business we knew something about the charge card business from having read many, many publications, having talked to other banks. We knew it was an expensive business to get into. We knew if you were going to break even, you had to bet [sic] the maximum that you could get because the startup costs were very high. The fraud losses. The credit losses were very high. And even at the maximum

rate we were confident that there was [sic] going to be several years before you even broke even on this business.

Confidential internal reports prepared by Harris' Financial and Economic Research Department in August and September, 1966 projected substantial losses for the first few years of the program. Assuming an equal sharing of merchant discounts and receivables with its correspondents, Harris' study projected early losses of $800,000.00 and predicted that cumulative profitability would not be reached until the sixth year of operations.

In autumn of 1966, Central National Bank[6] joined the group, apparently concluding that it could neither become a separate, independent card issuer because it lacked a sufficiently broad base in retail and merchant customers nor afford not to offer such a customer service because of potential customer loss. Pullman also joined the group. On October 24, 1966 First, Continental, Harris, Central and Pullman executed an interim agreement establishing the Midwest Bank Card System, Inc. Its operating regulations[7] mandated uniformity in card format and design, advertising by merchants, return of merchandise procedures, transaction reporting procedures, and floor limits. Membership was open to any commercial bank without geographical limit. All defendants except American[8] entered the market at the same time, issuing their bank charge cards in the autumn of 1966 at a single interest rate. The rate has not changed since that time.

B. Recruitment of Correspondent Banks of Continental[9]

During the summer of 1966, Continental began to recruit correspondent participation in the charge card program. Continental held meetings with correspondent banks to disseminate information about and solicit participation in its Town and Country program. Notes of remarks prepared for delivery by Donald M. Graham of Continental at one such meeting state:

When we decided to embark on the card program we made a fundamental decision. This was to the effect that our system must be developed and implemented in a way that would merit the complete support and participation of our correspondent banks. It could not be a "Continental Plan" because we cannot in fairness promote Continental's name at the expense of our correspondents . . . In assuming this posture, we are not asking you to believe that we are *magnanimous*, but only that we are *realistic*. For we know that this plan can succeed only with your support, and we know that such support can be merited only if we play this game by ground rules that are equitable and that accord full respect for your position as our partners. I believe you will find, as the program unfolds this morning, that the concept we have created achieves that objective.

Graham's notes prepared for a similar meeting contain the statement:

Because of antitrust implications, we are advised by counsel that we cannot attend meetings where our competitors are present and at which discounts, [prices, scratched out] terms, and conditions are discussed. However, there is no reason why we cannot have meetings such as this one with our own Town & Country banks. Moreover, I want to point out that if you so desire, our people will come to you at any time to discuss our mutual

---

6. Central was a correspondent of Harris and Continental.

7. The only copy of operating regulations in evidence is marked effective as of July 10, 1969. The court assumes the regulations to be identical to those adopted in October, 1966.

8. American filed an application for membership in Midwest on March 26, 1969 and became a member on May 16, 1969.

9. Because only Continental has moved for summary judgment on the allegations of vertical conspiracy contained in Counts III and IV, the court will not review in a detailed fashion plaintiffs' evidence regarding the relationships between the other defendants and their respective correspondents.

problems, providing such meetings are confined to banks participating in the Town & Country program.

Continental's study of the program's feasibility shows an awareness of the fact that, if it proceeded alone, it would have to solicit correspondent banks' merchant clients for accounts, which would damage its business relationship with the correspondents. The same study shows Continental's knowledge that soliciting correspondents' merchants might make correspondents choose to enter the market to solicit merchants and sign cardholders, action which would have diluted the market available to Continental.

Continental distributed outlines of the plan to correspondent banks; and, as follows, explained the proposed procedure for direct participation.

> A participating merchant would sell merchandise or services to a card-holding customer and imprint a sales slip with the customer's name and other information on the charge card.
>
> The merchant would deposit the sales slip with his bank, which would credit the merchant's account with the face amount of the sales slip, less discount, as agreed upon between the merchant and his bank. The bank receiving the sales slip would forward it to the bank which issued the charge card which in turn would pay the sending bank the amount of the sales slip. This forwarding process probably would be through a clearing facility similar to that used for clearing ordinary bank checks.
>
> The bank which issued the charge card would bill the cardholder periodically for the unpaid balance in his card account plus any fees or interest charges agreed upon between the bank and its customer. Any bank in the Chicago Metropolitan Area (including the two Indiana counties) and later expanded to the entire State would be eligible to participate as a mem-

ber of the system, either as an issuer of credit cards or a processor of merchant sales slips, or both. Each member bank would be free to set its own terms on which it would do business with its card holding customers and its merchants.[10]

Ultimately, Continental began to communicate information concerning cardholder interest rate to correspondents who had chosen to affiliate with the Town and Country program. Continental mailed explanatory memoranda to correspondents which contained interest rate information.[11] Continental's feasibility study limited dissemination of interest information to banks which elected to join the Town and Country program:

> The compatible system allows any bank to enter the system as either a merchant bank or a cardholder bank. Continental stands ready to help correspondents in any way possible . . .. Because of antitrust implications, Continental cannot discuss merchant or cardholder rates or terms [with correspondent banks which elect to become full card-issuing members of the compatible system].

Continental's contract with its correspondent provided that the latter would cooperate in recruiting merchants and in furnishing names of potential cardholder customers to Continental.[12] Cards issued through the correspondent would bear the correspondent's name, rather than Continental's. The correspondent would also arrange for Continental to explain to correspondent merchant clients the operational procedures. Participating merchants would deposit sales slips with the correspondent, which would receive a portion of the merchant discount income when the slips were turned over to Continental.

Because Continental, and not the correspondent, extended credit to the cardholder, Continental determined and fixed the inter-

---

**10.** Other banks sent out similar mailings.

**11.** First distributed to its correspondent banks copies of its standard form contract for participation in the FirstCard correspondent plan, which contained interest rate information.

**12.** Other defendants' contracts contained similar provisions.

est rate. The correspondent bank agreement provides:

> Correspondent shall have no obligation with respect to any credit risk or collection expense with respect to any amount owing by reason of the use of a Town & Country Correspondent Card or other Midwest Bank Card.

The contracts between Continental and its correspondents as of November, 1966, February, 1970, and thereafter, make no reference to the cardholder interest rate to be charged. They also do not contain any requirement that the correspondent refrain from becoming a card-issuing bank and are terminable at will by the correspondent on 30 days notice. Moreover, in the autumn of 1967, Continental sent correspondents a summary of various ways of engaging in the charge card business besides participation in the Town and Country program.

While under the standard form contract, Continental correspondents were entitled to a percentage of the merchant discount income only, three of the correspondents ultimately executed participation agreements entitling them to a percentage of the finance charge receipts in exchange for proportionate responsibility for loss sharing in the event of non-payment by the cardholder. These banks were the First National Bank of Springfield, the Palatine National Bank, and the Sandwich State Bank. None of Continental's other Town and Country correspondents shares in interest income.

C. American's Entry into the Midwest Bank Card System

American did not join the Midwest Bank Card System, Inc. until the spring of 1969, although Rod Daly, an American operations officer, attended some of the Midwest organizational meetings in 1966. At that time, Daly reported the mechanics of setting up a charge card system to Allen P. Stults, American's chairman of the board of directors and chief executive officer.[13] In late 1968, an American employee, Arthur Stump, met with Robert M. Martindale, Midwest's president, "to find out what [Midwest] was doing with charge cards, what people were doing with charge cards to better relate to what [American] might do." American subsequently hired James R. Kennedy, a former Continental employee whose job had been to oversee the Town and Country program and who was, as Stump explained, "thoroughly versed in charge cards."[14] Kennedy joined American as a second vice-president in charge of the bank's charge card operations, which he designed, instituted, and managed.

American determined to charge 1.5% per month for extended payment privileges "after consideration of a number of business factors such as the maximum interest rate permitted by law, projections concerning the length of time before American's bank card program might become profitable, and the interest rates charged under other credit arrangements such as those offered by various retail stores, banks, and gasoline companies." The interest rate was never discussed with other bank representatives; and the rate determination was based entirely on deliberation and discussion among American officers and employees. Throughout his deposition, Kennedy's testimony on this point remained consistent, although he acknowledged that he was aware of the interest rate charged by other banks and various retailers, as a matter of public

---

13. Stults explained Daly's investigation as follows:

> I don't know that he knew what other Chicago banks were planning. He knew what had come out of discussions that were had at the time as to the mechanical means of handling this by way of being informed in the event we were going to go into the business . . . He acquired knowledge of what would be necessary for us to do things and our discussion was on that basis. I never asked him where did you get this or how did you do it or

whether he got it reading books or keeping his ear to the ground.

14. Plaintiffs have stressed the fact that Kennedy was employed by both Continental and American. While Kennedy played a role in determining American's interest rate policy, his uncontradicted deposition testimony establishes that Continental's charge card interest rate was set before he joined Continental and that he became aware of it in the process of checking cardholder applications which set out credit terms.

knowledge or, in the case of Harris' rate, because he was a Harris Charge-It cardholder. Stults testified that the rate determination followed the recommendation of Kennedy and Robert P. Abate, another American officer, after discussion among the bank's executives. Moreover, American's internal study of the card program, prepared by Kennedy, projected that the program would not break even until its fourth year and that accumulated losses would not be recouped until its seventh year.

## D. Entry in the Interbank Card Association

In February, 1967, the Interbank Card Association was formed to compete nationally with Bank of America's BankAmericard Service Corporation, the only other national bank charge card system. In April, 1967 Harris, Continental and First representatives met with Interbank personnel in New York to discuss Midwest's possible entry into Interbank. All three banks had been interested in the idea of a nationwide charge card system even before the formation of Midwest.[15]

An internal Continental analysis of negative factors relating to the decision to join Interbank emphasized that the advantage of increased negotiability of an Interbank Master Charge card would be offset by several disadvantages. These included a vastly greater fraud risk due to the bank's lack of technical expertise with a nationwide system, greater competition for merchant accounts, loss of regional sensitivity, and increased difficulty in achieving product differentiation. The study also reveals concern about possible antitrust problems:

> With any system acquiring the nationwide dominance that the Interbank Association with the Master Charge Card face is acquiring, there is always some poten-

tial antitrust risk. In the opinion of our law firm, as well as counsel for Midwest and Interbank, this risk is not significant as both membership in Interbank and a license to issue Master Charge are nonexclusive and available to all applicants.

The study also stated:

> In any interchange environment, there is a possibility of intense competition driving discount rates to lower levels, as was evident here in Midwest. Presently, the transaction assessment incorporated within the Interbank regulations completely neutralizes this risk and results in a higher level of merchant discount rates than the par exchange we now have in Midwest. The Justice Department requires that the validity of this assessment be reviewed yearly and Touche Ross is now conducting this review.

In spite of these recognized difficulties, Midwest tentatively decided to join Interbank on November 8, 1968, providing that the details could be worked out. First, Harris and Continental agreed then that movement into Interbank had to be slow because of their lack of experience with a national program and its new fraud and credit problems. The Midwest Bank Card System formally joined Interbank on January 1, 1969. Harris breached the agreement to proceed slowly by issuing its Master Charge cards in May, 1969, prior to any Midwest coordinated card issuance. First left Midwest in January, 1970 to join BankAmericard and began soliciting the defendants' correspondent banks to participate in the BankAmericard program.

## II.

Continental, Harris and American argue that none of the 964 documents nor the deposition testimony of 53 witnesses[16] on which plaintiffs say[17] they will rely at trial

---

15. Aside from various meetings held with Interbank, Midwest members investigated other charge card systems with nationwide membership or potential membership. In early February, 1967, Midwest representatives met with California Bank Card Association personnel and with Bank of America representatives.

16. Thirty-six of the 53 witnesses named by plaintiffs have been deposed.

17. In answers to interrogatories filed January 6, 1978, plaintiffs specifically identified the documents and witnesses upon which they will

supports an inference of conspiracy among the defendants to fix the interest rate as alleged in Counts I through IV of the third amended complaint.[18] Rather, each defendant points to deposition testimony and documentary evidence which disclose that their decisions to charge 1.5% per month for deferred payment privileges were independent business decisions.

In support of its motion for summary judgment, Continental relies on the deposition of David M. Kennedy who testified that, in the summer of 1966, the only interest rate discussions he could recall were with Continental personnel:

> I was concerned about getting the highest interest rate legally permissible in order to—if we could—make it profitable. And so I was anxious to see that we get it up at the one and a half percent level, if we could.

Kennedy categorically denied discussing interest rates with representatives of First or of any defendant bank. Continental also relies on its correspondence with the Comptroller of the Currency and the deposition testimony of its officers and executives who worked on the program, all of whom deny that interest rates were discussed with the other alleged conspirators, or that the policy was other than independently formulated and implemented.

Harris makes an identical argument, based on the testimony of Carroll E. Prater and its independent loss projection studies. Harris also argues that 1.5% per month was the going market rate of revolving retail credit in 1965 and 1966, and that this fact was a matter of common knowledge among bankers and the general public.

While joining in its co-defendants' arguments, American states additional grounds which, it argues, make summary judgment

on Count II[19] particularly appropriate as to it. Like the other defendants, in support of the argument that its choice of interest rate was independent, American relies on the affidavit and deposition testimony of its officers, James R. Kennedy and Allen P. Stults, and on its internal study which projected years of losses before its card program would become profitable. However, unlike the other defendants, American did not enter the charge card business until three years after its co-defendants; and hence, it argues, played no role in the formation of the Midwest Bank Card System when the alleged conspiracy originated.

Plaintiffs oppose the motions, arguing that the uniformity of interest rate, the evidence showing opportunity to conspire during organizational and informal meetings during Midwest's formation and integration into Interbank, the market structure, and the artificial product standardization through the interchange system raise material issues of fact as to whether there existed a conspiracy to fix the interest rate. Plaintiffs' expert witness characterizes the Chicago banking industry in 1966 as an oligopoly dominated by its four biggest banks: First, Continental, Harris, and Northern. Each of these banks maintained business relationships with various smaller correspondent banks. The oligopoly, plaintiffs urge, provided the structural potential for collusion. As evidence of collusion, plaintiffs rely on deposition testimony by John B. Tingleff, a Continental executive, that in 1966 and 1967, charge cards were "a lively and pertinent topic" for bankers and that interest rates "probably . . . came up" in the course of various formal and informal bankers meetings. Robert M. Martindale, Midwest's president, and Allen P. Stults of American also testified regarding discussions of charge cards.[20] The nu-

---

rely at trial to prove their charges of horizontal conspiracy among the defendants to fix charge card interest rates.

**18.** The allegations of horizontal conspiracy are Count I, ¶ 17; Count II, ¶ 18; Count III, ¶ 18; and Count IV, ¶ 19.

**19.** Judge McMillen granted American's motion for summary judgment on Counts IV and VI, but denied the motion as to Count II, the only remaining count which names American. Decision, June 10, 1974 (McMillen, J.).

**20.** Excerpts of Martindale's deposition on which plaintiffs rely state:

merous organizational and social meetings offered many opportunities to conspire, plaintiffs argue. They insist that the restrictive provisions of Midwest's operating regulations further interfered with the development of competition in interest rates since defendants' cooperation consciously imposed limits on their ability to compete with each other.[21] Plaintiffs point to the deposition testimony of Gaylord A. Free-man, First's president and chairman of the board of directors, that "since nobody had a viable credit card [in 1966] and it was all new, if one of the others had aggressively merchandized the card at a lower [cardholder interest] rate, I think [First] would have had to go too, at the lower rate, too."[22] Plaintiffs argue that this evidence raises material issues of fact which bar entry of summary judgment.

> A. I have no recollection of any discussion concerning cardholder interest rate at Board of Directors meetings.
> Q. Other meetings besides Board of Directors meetings? . . . Formal or informal.
> A. The subject of cardholder interest rates was discussed often by banks and by people doing business with banks due to the truth in lending legislation being enacted, and before and after its enactment it continued to be a discussion or a point of discussion for both the public and the banks in communicating the amount of that rate to the public.
> Q. And in communicating between each other about the various problems of communicating with the public, for example, about those rates?
> A. I know of no official meeting or unofficial meeting for the purpose of discussing problems relating to the individual member banks in communicating that to their individual cardholders. I have no recollection of a specific meeting that that was the official topic or unofficial topic.

And plaintiffs similarly rely on Stults' deposition testimony:

> Q. Did you discuss bank credit cards with any officer of another Chicago area bank in 1966?
> A. If I had to guess, I would guess I must have. It was in the air. I don't recall any such conversations.

21. The effect of Midwest's regulations, plaintiffs urge, is summarized in a November 17, 1966 letter by Mark H. Baxter, a First vice-president, in response to an inquiry about the development of the FirstCard program.

> November 17, 1966
> Dear M. Hammerschlag:
> Bob Wilmouth has given me your letter because I had a major part in developing the marketing plans for FirstCard—our entry into the charge card business.
> The planning of this activity has developed over a three-year period, but the detailed plans were made during the past six months under a good deal of time pressure because of the competitive situation in Chicago.
> For a variety of reasons, we took the position that we did not want to enter this business unless we could provide a superior product for Midwest consumers and retailers. This attitude led to the development of the Midwest Bank Card system—a system of charge card banks which permits the interchange of sales slips and which makes any bank card good in any merchant establishment.
>
> The development of the Midwest Bank Card system was concurrent with our own marketing planning and we are far from finished with either of these projects.
> Here is some of the printed information about FirstCard and the Midwest Bank Card system which may give you a better understanding of what we are trying to do. We feel that our program and the MBC system represent a significant breakthrough in the charge card business and present a sound base for eventual nation-wide interchange among charge card banks.
> Mr. Douglas Freeth of the Marine Midland Corporation in Buffalo is leading a group of banks who expect to participate in national interchange shortly. I feel that the interchange concept has greatly changed many of the marketing considerations for the charge card business.
> You are quite correct in assuming that our basic marketing objectives and strategy are highly confidential, as is our marketing plan. The competitive situation in Chicago is much more severe than elsewhere in the country (including Pittsburgh) because five major banks have entered this business simultaneously and, in order to provide a better product for the customer we have all been willing to accept limitations which reduce our opportunity to gain a competitive advantage.
> I don't think there is very much more that I can tell you in a letter, but if you happen to be in Chicago I am sure one of us could spend some time with you and, if you have any specific questions, we would be glad to try to answer them.
>> Sincerely,
>> Mark H. Baxter
>> Vice-President

22. Plaintiffs have also devoted some argument in their brief to the defendants' joint lobbying

**208**

### III.

■ These facts are governed by the following principles of law. In a motion for summary judgment, the moving party must sustain the burden of showing the absence of any genuine issue of fact; and all evidence and inferences therefrom must be construed in the light most favorable to the opposing party. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Rule 56, Fed.R.Civ.P. Particularly in antitrust suits, the remedy of summary judgment should be sparingly used since the evidence is likely to be complicated and extensive. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *see also Norfolk Monument Co. v. Woodlawn Memorial Garden, Inc.,* 394 U.S. 700, 704, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969). And it is the rare case where the evidence available to both sides is fully explored before trial and where the defendants can establish that the evidence is not susceptible of the inferences plaintiffs urge. *Modern Home Institute, Inc. v. Hartford Acc. & Ind. Co.,* 513 F.2d 102, 109 (2d Cir. 1975). However, once the moving party has met the burden imposed by Rule 56 and has demonstrated that the facts on which the plaintiffs rely are not susceptible of the interpretation sought to be given them, plaintiffs must show the existence of significant probative evidence supporting the inference urged by them or face summary judgment dismissing the complaint. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Mod-*

*ern Home Institute, Inc. v. Hartford Acc. & Ind. Co.,* 513 F.2d at 109 n. 10.

■ This case has been pending for eight years, during which plaintiffs have conducted substantially unlimited discovery, including at least 71 depositions, 297 interrogatories, 128 requests for admission, and innumerable document production requests. In their answers to interrogatories filed January 6, 1978, plaintiffs identified 964 documents and named 53 witnesses on whose testimony they intend to rely at trial to establish their conspiracy charges. Hence summary judgment cannot be denied because of the incompleteness or inconclusiveness of the factual record, or because of substantial credibility issues, such as influenced the Supreme Court in reversing a grant of summary judgment in *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458. Plaintiffs have confronted all the defendants' officers and employees who were involved in any way in the development and implementation of the various bank programs, the establishment of Midwest, and the entry into Interbank. The available documentary evidence has also been exhausted; plaintiffs have had ample opportunity, of which they have availed themselves, to examine defendants' files and records for any document relating to the setting of cardholder interest rates.

■ Under these circumstances, unless plaintiffs have uncovered evidence supporting their conspiracy charge, it is unclear how, in the face of defendants' uncontradicted deposition testimony negating it, tri-

in the Illinois state legislature for clarifying legislation on charge card interest rates. Such joint activity is immunized from antitrust liability under *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). *See also Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220, 227–28 (7th Cir. 1975). While dicta in *Pennington* suggests that evidence of lobbying may be introduced to show the purpose and character of other transactions under scrutiny, the decision whether to admit such evidence rests in the discretion of the trial judge. 381 U.S. at 670 71 n. 3, 85 S.Ct. 1585; *Lamb Enterprises v. Toledo Blade Co.,* 461 F.2d

506, 516 (6th Cir.), *cert. denied,* 409 U.S. 1001, 93 S.Ct. 325, 34 L.Ed.2d 262 (1972); *United States v. Johns-Manville Corp.,* 259 F.Supp. 440, 453 (E.D.Pa.1966). Recognizing that formalistic exclusionary rulings have no place in disposition of motions for summary judgment, the court must nonetheless decline to consider evidence of defendants' joint lobbying. The court has serious misgivings as to the propriety of relying on such evidence, in light of its minimal probative value as well as inevitable prejudicial effect on a jury. Accordingly, it will not be considered here as evidence in opposition to defendants' motions for summary judgment. *See* 6 J. Moore's Federal Practice ¶ 56.11[1.–8], at 56- 05–07 (2d ed. 1976).

al would give them any further opportunity to elicit from defendants, their officers, and employees, evidence tending to prove it. If the most that can be hoped for is the possibility of discrediting defendants' denials at trial, no issue of material fact is presented. *Modern Home Institute, Inc. v. Hartford Acc. & Ind. Co.*, 513 F.2d at 110. "[S]ummary judgment cannot be defeated by the vague hope that something may turn up at trial." *Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969). "Facing the sworn denial[s] of the existence of conspiracy, it [is] up to plaintiff[s] to produce significant probative evidence by affidavit or deposition that conspiracy existed if summary judgment [is] to be avoided." *Lamb's Patio Theatre v. Universal Film Exchanges*, 582 F.2d 1068, 1070 (7th Cir. 1978).

■ It is settled that parallel business behavior is insufficient by itself to find a conspiracy that violates the Sherman Act. In *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939), a movie theater chain sent identical letters to eight distributor defendants, disclosing the names of the other addressees and demanding that the distributors require first run theaters leasing films from them to charge at least 40¢ admission and that second run theaters charge at least 25¢ and refrain from showing double bills. In affirming the conviction, the Supreme Court held that where all defendants had knowledge of the restrictions imposed by the others, and knew they would profit from concerted action and suffer from taking the complained of action alone, the lack of any direct evidence of agreement was not fatal to a finding of conspiracy. The Court stressed that defendants had no witness testify to deny the conspiracy. 306 U.S. at 225–26, 59 S.Ct. 467. In *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954), the owner of a suburban theater sued several film distributors who had all refused to give him first run films. Defendants denied they had engaged in concerted action and presented evidence of economic reasons for their independent refus-

als to deal with the plaintiff. The trial judge denied plaintiff's motion for a directed verdict and the jury returned a verdict for defendants on the issue of conspiracy. In affirming that plaintiff had no right to a directed verdict, the Court stated:

> To be sure, business behavior is admissible circumstantial evidence from which the fact finder may infer agreement. . . . But this Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense. 346 U.S. at 540–41, 74 S.Ct. at 259. (Citations omitted.)

Then, in *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569, the Court upheld a grant of summary judgment despite plaintiff's showing of parallel business behavior by defendants. Plaintiff there complained of a joint refusal by defendants to purchase Iranian oil which he sought to sell. His only evidence of Cities Service's participation in the alleged conspiracy was its refusal to buy oil from him. In its motion for summary judgment, Cities Service adduced evidence of independent economic reasons for its refusal to do business with plaintiff and evidence that, insofar as the oil business was concerned, its interests were more similar to plaintiff's than to those of its alleged co-conspirators. In affirming the grant of summary judgment, the Court distinguished *Interstate Circuit*, finding that it

> differs from the case at hand in precisely the same way that *Poller* [*v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458] does, namely, in the inferences of motive that can reasonably be drawn from the facts. The reason that the absence of direct agreement in *Interstate Circuit* was not fatal is that the distributors all had the same motive to enter into a tacit agreement. . . . Here Waldron is unable to point to any benefits to be obtained by Cities from refusing to deal with him and, therefore, the inference of conspiracy sought to be drawn from Cities' "par-

allel refusal to deal" does not logically follow.

*Theatre Enterprises* . . . merely reiterated the holding of *Interstate Circuit* that "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement" . . in the course of ruling that the parallel behavior there shown did raise a conspiracy issue for the jury, which permissibly resolved it in the defendants' favor on the basis of other contrary evidence in the case. It did not purport to deal with the situation where the interests of the parties whose behavior was "consciously parallel" were substantially divergent and thus is inapplicable here. 391 U.S. at 287–88, 88 S.Ct. at 1592 (Citations and footnotes omitted.)

■ From these cases, the rule emerges that while proof of parallel business activity does not in itself establish a Sherman Act violation, it is circumstantial evidence from which an agreement may be inferred. However, such evidence, standing alone, "is insufficient unless the circumstances under which it occurred make the inference of rational, independent choice less attractive than that of concerted action." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *see also Independent Iron Works, Inc. v. United States Steel Corp.*, 322 F.2d 656, 661 (9th Cir.), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963); *FTC v. Lukens Steel Co.*, 454 F.Supp. 1182 (D.D.C.1978). The test has been stated in various ways. One court has said that the inference of concerted action is warranted in circumstances where there is:

(1) a showing of acts by defendants in contradiction of their own economic interests . . .; and

(2) satisfactory demonstration of a motivation to enter an agreement . . ..

*Venzie Corp. v. United States Mineral Prod. Co.*, 521 F.2d 1309, 1314 (3d Cir. 1975).

Other cases speak in terms of a "plus factor" which presence is required, along with a showing of parallel business behavior, to justify an inference of conspiracy. *Gainesville Utilities v. Florida Power & Light Co.*, 573 F.2d 292, 301 n. 13 (5th Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 454, 58 L.Ed.2d 424 (1978), and cases cited therein; *see generally* L. Sullivan, *Handbook of Antitrust* 315–19 (1977). The test cannot be mechanically applied. The question is whether the evidence taken as a whole warrants an inference of joint, consensual conduct rather than independent, individual action. Moreover, inferences drawn from circumstantial evidence must be logical and reasonable, not based on speculation or conjecture. *Franck v. Carborundum Co.*, 437 F.Supp. 83, 85 (N.D.Cal.1977).

■ The court turns, then, to apply these rules to the case before it. The heart of plaintiffs' case rests on evidence, which defendants do not contest, showing the universal adoption of identical cardholder interest rates which have not changed since the inception of Midwest. Plaintiffs argue, and defendants concede, that an identity of interest rates was not essential to the success of the Midwest Bank Card System, since each defendant dealt separately with its cardholding customers and individually different interest rates in theory could have evolved without affecting the system as a whole. Such rates could, and plaintiffs urge, should have been based on the creditworthiness of individual cardholders. However, defendants' affidavits, deposition testimony, answers to interrogatories and documentary evidence show that Continental, Harris and American independently projected high start-up costs and early losses; they independently determined their respective programs required that the highest interest rate legally permissible be charged. The uncontradicted testimony of every bank employee consistently denies that interest rates were discussed among the alleged co-conspirators, or that interest rates were consensually determined. The showing of parallel behavior under these circumstances, where each bank faced identical problems of fraud, credit losses, and large initial expense to which reasonable busi-

nessmen would react in the same fashion, does not provide a basis for the inference of the conspiracy which plaintiffs allege.

■ The burden then shifts to plaintiffs to come forward with significant probative evidence tending to support the complaint, to show that the rate set was counter to defendants' interests and accompanied by a motive to enter into an agreement, to demonstrate a "plus factor", or face summary judgment dismissing the complaint. *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. at 289–90, 88 S.Ct. 1575; *Venzie Corp. v. United States Mineral Prod. Co.,* 521 F.2d at 1314; *Gainesville Utilities v. Florida Power & Light Co.,* 573 F.2d at 301 n. 13. In an effort to discharge this burden, plaintiffs rely on evidence of opportunity to conspire, market structure, similarity of economic interest among defendants and the mechanics of the interchange system.

With regard to opportunity to conspire, one court has said:

> Opportunity evidence may be arranged along a continuum of persuasiveness, from that which merely prevents a negative inference by demonstrating that communication and thus agreement were physically possible, to evidence of specific contacts and exchanges of information or suggestion which makes agreement in some measure more probable. *Overseas Motors, Inc. v. Import Motors Limited, Inc.,* 375 F.Supp. 499, 534 (E.D.Mich. 1974), *aff'd,* 519 F.2d 119 (6th Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975).

Most of plaintiffs' evidence is opportunity evidence and the bulk of that evidence is in the "mere possibility" range. Into this range falls evidence that many of defendants' officers were acquainted socially and professionally and that bank charge cards were a "lively and pertinent topic" for bankers in 1966 and 1967, a topic that was "in the air." However, plaintiffs rely most heavily on the numerous organizational meetings between defendants to set up Midwest and to enter Interbank as "specific contacts" which provided multiple opportunities to conspire. But plaintiffs have confronted every person who attended those meetings, examined the minutes of and documents generated by each meeting, and found no evidence which affirmatively supports their theory.

The evidence shows that defendants were aware of potential antitrust problems when they established Midwest; and hence, were careful not to discuss rate-setting nor to conduct joint market research. Plaintiffs point to internal memoranda by Continental and Harris concerning timing the service's introduction to avoid market "chaos". But these documents as a whole do not offer a basis for an inference of conspiracy. Rather, they reflect concern over implementing the compatible system. For the alternative to the compatible system would have been for each bank to set up its own program where its cards could be used only at merchant places of business which signed with such bank. To obtain the same volume of customer use, each merchant would have to sign as many agreements as there were banks with charge card programs. Merchants would have to distinguish between a substantial number of card issuers, each with a different system of regulations to be followed. Cardholders would have to make a special effort to search out merchants who had signed agreements covering the particular card that they carried. The memoranda discuss avoiding this multiple program situation and making the charge cards commercially feasible from the merchant's point of view by making them widely negotiable through the compatible system. The market "chaos" was to be avoided by compatibility in delivery of the charge card service, which is unrelated to payment for the use of the credit.

Only two documents produced during discovery even mention the subject of interest rates. The minutes of the May 22, 1966 meeting attended by First, Harris and Northern representatives state:

> Lewis [of Harris] commented that the maximum must be no more than the equivalent of 7% add-on per annum or less than 14%. Foote [of Harris], who

said he had looked into credit cards on his own for Harris some months ago, found specific revolving credit enabling legislation in other states where 1½% per month is in effect. Wood [of First] commented that this is troubling First's lawyers, too. Representatives of the same three banks attended a meeting four days later which minutes state: "Wood [of First] said the First's lawyers had two legal questions—rate and antitrust—and the antitrust seemed to be the easier of the two." But these expressions of questions concerning the legal environment faced by the banks do not constitute a discussion of any bank's intention as to what rate it might ultimately charge. Plaintiffs concede, as they must, that the banking industry is heavily regulated; the legislature determines the top price which may be charged for bank credit. The casual expression of concern over the impact of regulation cannot sustain an inference of conspiracy.

Midwest's coordinated entry into Interbank offers plaintiffs no support. Plaintiffs rely on a Continental internal memorandum analyzing the drawbacks of Interbank membership. But the document does no more than state the problems posed by participation in a large compatible system: the greater fraud and credit risks raised by a national market in which Continental lacked expertise. The passing reference to Interbank's different procedure for handling merchant discount does not compel an inference of interest rate conspiracy. Moreover, the court notes that summary judgment has been entered for defendants on the charges of conspiracy to fix the merchant discount rates.[23]

Defendants have offered sworn denials of the existence of conspiracy, and a persuasive rationale for their parallel conduct which is consistent with their individual interests and with independent competitive behavior. Under these circumstances, the inferential leap from opportunity to conspiracy is illogical. And evidence of opportunity to conspire here cannot alone bar summary judgment, for "[i]f the most that

can be hoped for is the discrediting of defendants' denials at trial, no question of material fact is presented." *Modern Home Institute, Inc. v. Hartford Acc. & Ind. Co.,* 513 F.2d at 110.

Plaintiffs' argument regarding market structure requires a similar response, for it is simply a variation of their argument regarding opportunity to conspire. Plaintiffs argue that the market structure of the Chicago banking industry in 1966 was oligopolistic and therefore conducive to collusion. Even assuming this characterization to have merit, it cannot constitute a "plus factor" sufficient to bar summary judgment. The fact that market structure might have permitted collusion does not allow the inference that collusion occurred where, as here, defendants have offered sworn, credible denials of the existence of conspiracy and years of discovery by plaintiffs has uncovered no affirmative evidence of this kind of conduct.

Plaintiffs argue that "common interests and needs" of the defendants made collusion "feasible and often desirable." But to hold this sufficient to raise an inference of conspiracy "would give free rein to any plaintiff who can draft an antitrust complaint capable of withstanding a motion to dismiss to go to trial with only a wing and a prayer supporting his well drafted complaint." *Mutual Fund Investors v. Putnam Management Co.,* 553 F.2d 620, 624 (9th Cir. 1977); *see also Lupia v. Stella D'Oro Biscuit Co.,* 586 F.2d 1163, 1167 (7th Cir. 1978); *Solomon v. Houston Corrugated Box Co.,* 526 F.2d 389, 393–94 (5th Cir. 1976). Plaintiffs mistakenly believe that summary judgment cannot be granted unless the moving defendants can show that their interests are divergent from those with whom they allegedly have conspired. But if this were so, then defendants with similar business problems who respond to those problems in independent identical fashion could never successfully move for summary judgment; the complaint would be sufficient to raise an inference of conspiracy. But Rule

23. *See* n. 2, *supra.*

56 does not apply differently to antitrust cases than to others. Here, defendants have shown that the rate each charged was mandated by their individual needs and not counter to their individual interests. *See Venzie Corp. v. United States Mineral Prod. Co.,* 521 F.2d at 1314. The fact that each faced similar business problems does not support an inference of conspiracy.

Plaintiffs point to the mechanics of the interchange system as evidence of artificial product standardization and of barriers to potential entry from which an inference of conspiracy may be drawn. However, the most rational inference that can be drawn from the uniformity of card format, imprinter, sales slips, and merchant regulations is that these features were necessary for the operation of a compatible card system. In this context, it is important to bear in mind that the compatible card system is not itself under antitrust attack; the by-laws and operating regulations on which plaintiffs rely have nothing directly to do with interest rate or other terms of credit between any bank and its customers. As Carroll E. Prater of Harris stated:

> Obviously [the Midwest] system to insure prompt interchange of sales slips between banks had to include a uniform type credit card with a common identification mark or logogram, a uniform sales slip for merchant use, a standard type machine for functioning the sales slips, and finally the key to the whole compatible system___a method of clearing or transferring slips between banks.

The uniform floor limits, advertising limitations, merchandise return procedures, transaction reporting procedures, card format and design, and cash advance limits are most logically construed as mechanical rules for performing the sales, reporting and cash advance functions of the compatible card system. The uniform floor limit is the dollar amount of the sale by any merchant, which, if exceeded, requires the merchant to call the card-issuing bank to receive authority to make the sale. Its uniformity removes the necessity for the merchant to distinguish between the cards of different banks when making sales; it increases the cards' negotiability by making it simpler for merchants to honor them. Uniform advertising limitations, card format, and design similarly increase the cards' negotiability by preventing confusion over whether a merchant will honor only charge cards issued by only one bank as distinguished from those issued by all the banks. Uniform merchandise return procedures reduce the opportunity for fraudulent billing by requiring that refunds to customers who have been charged for purchases on their bank charge cards be by credit slip issued by the merchant rather than in cash. Uniform transaction reporting procedures facilitate the transfer of slips between banks. Uniform cash advance limits are agreements by which Bank A, a system member, agrees with Bank B, also a system member, that it will make cash advances in particular amounts to Bank B's customers if Bank B will make advances in the same amounts to Bank A's customers. The uniformity eliminates the need for a teller to determine whether a particular restriction exists with respect to any particular card when its holder seeks a cash advance; it is a feature of compatibility which increases card negotiability. Hence, none of the mechanical details on which plaintiffs rely are anything more than contractual provisions to facilitate the sales, reporting, and cash advance features of the compatible card system. They do not supply a "plus factor" warranting an inference of conspiracy to fix the interest rate.

An examination of the cases on which plaintiffs rely shows the propriety of granting summary judgment in this case. In *C–O–Two Fire Equipment Co. v. United States,* 197 F.2d 489 (9th Cir.), *cert. denied,* 344 U.S. 892, 73 S.Ct. 102, 97 L.Ed. 695 (1952), the court upheld a Sherman Act conviction for price-fixing where four competing manufacturers held regular meetings, engaged in a stringent product standardization program, raised prices at a time of industry surplus, made identical bids on public contracts, used illegal identical restrictive licensing agreements, and rigorously policed these arrangements. Plain-

tiffs argue that in *C–O–Two* the court found the meetings a "plus factor" even though there was no direct evidence of what transpired at the meetings and therefore this court should draw the same conclusion regarding the Midwest meetings. 197 F.2d at 493. Plaintiffs mistake the significance of the meetings in the view of the court in *C–O–Two*; the finding of conspiracy was held to be warranted in light of the other factors: identical bids, unnecessary product standardization, illegal licensing contracts, dealer policing, and identical price increases at times of surplus, coupled with the fact that the defendants offered no evidence in rebuttal. 197 F.2d at 491, 496–97. Unlike this case, in *C–O–Two,* the inference of concerted action was stronger than that of independent action.

In *Cackling Acres, Inc. v. Olson Farms, Inc.,* 541 F.2d 242 (10th Cir. 1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977), the court affirmed a jury verdict for plaintiff egg producers who sued several egg distributors alleging a conspiracy to depress the price of eggs. In holding the evidence sufficient to support a finding of conspiracy, the court relied on evidence, not specifically discussed, of numerous meetings and telephone calls "all in furtherance of the conspiracy to peg egg prices . . . ." 541 F.2d at 245. In this case, there is no affirmative evidence of actions by the defendants in furtherance of a conspiracy.

In *Gainesville Utilities v. Florida Power & Light Co.,* 573 F.2d 292, the court reversed a jury verdict and held that the evidence compelled a finding of conspiracy to divide the state wholesale power market. Plaintiff, a municipal utilities system, brought suit against a utility company that refused to interconnect with the city's power system, alleging that the refusal was based on the company's unwillingness to invade its competitor's territory. The court rejected defendant's argument that the refusal was based on independent business reasons since the evidence showed a constant stream of correspondence between defendant's and its competitor's executives which not only shared information regarding the refusal but expressed the decision "in terms of hopeful, if not expected, reciprocity." 573 F.2d at 301. The court found that the constant exhortations of reciprocity against a backdrop of prior territorial division agreements, along with the fact that there could be no conceivable business reason for communicating with the competitor, mandated a finding of conspiracy. *Id.* Plaintiffs argue that the exchange of letters here, as in *Gainesville Utilities,* warrants a conspiracy finding. But there, it was not the mere fact of correspondence, but the letters' content, which led the court to find a conspiracy. In this case, such correspondence as exists is not inculpating and was reasonably required by the lawful joint venture in which defendants were engaged.

Accordingly, whether viewed as a failure to produce significant probative evidence tending to support the complaint, or evidence of action contrary to their economic interests and of motivation to conspire, or evidence of a "plus factor", plaintiffs have failed to rebut defendants' showing that the complained of conduct was the product of independent business decisions rather than of conspiracy. Under these circumstances, defendants' motions for summary judgment as to the horizontal conspiracy allegations of the complaint must be granted.

The court now turns to Continental's motion for summary judgment as to the charges of vertical conspiracy between it and its correspondents in Counts III and IV of the third amended complaint. In support of its motion, Continental has submitted the affidavit of John B. Tingleff, its vice-president in charge of correspondent banking in the midwest and, in 1966, in charge of implementing the Town and Country program. Tingleff avers that nothing in the contracts implementing the program fixed or was meant to fix any cardholder interest rate charged by Continental or its correspondent banks, nor to allocate customers, nor to obligate other contracting banks to refrain from competing with Continental. He states that there was no agreement, by contract or other-

wise, on these subjects with the correspondent banks. Continental also relies on the standard form contracts between itself and its correspondents, which make no reference to interest rate, contain no requirement that the correspondent refrain from becoming a card-issuing bank, and are terminable at will by the correspondent on thirty days notice. Taken together, Continental argues, the contracts and affidavit establish that there never was a conspiracy between itself and its correspondents.

Plaintiffs urge that the evidence adduced during discovery is sufficient to warrant the inference that Continental divided the bank charge card market with its correspondent banks, thus avoiding the possibility of dilution of the potential cardholder market and the introduction of price competition, had correspondents chosen to become card-issuing banks, and that Continental and its correspondents fixed the cardholder interest rate. To support these assertions, plaintiffs rely on the fact that no card-issuing competition actually ever developed between Continental and its correspondents, coupled with notes of remarks prepared for delivery by Continental officers at correspondent recruitment meetings, and the dissemination of interest rate information to correspondents who elected to participate in the Town and Country program.

 The fact that card-issuing competition did not develop is insufficient to raise an inference of conspiracy in light of defendant's affidavit and documentary evidence denying the existence of conspiracy. Like plaintiffs' arguments regarding the named defendants' parallel business behavior, plaintiffs' arguments regarding the lack of competition cannot raise an issue of material fact which will bar summary judgment absent a showing of significant probative evidence tending to support the complaint, or a showing of acts counter to the correspondents' and Continental's interests coupled with a motive to conspire, or a

showing of a "plus factor". *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. at 289–90, 88 S.Ct. 1575; *Venzie Corp. v. United States Mineral Prod. Co.,* 521 F.2d at 1314; *Gainesville Utilities v. Florida Power & Light Co.,* 573 F.2d at 301 n. 13.

Plaintiffs argue that the recruitment meetings constitute a "plus factor" since they offered Continental and its correspondents numerous opportunities to conspire. But plaintiffs have confronted all the witnesses and examined all the documents generated by those meetings and none of their proffered evidence even suggests a single instance in which any Continental representative sought or obtained any views or opinions from a correspondent banker, much less agreed with any correspondent banker, on the rate to be charged cardholders. Indeed, notes of remarks prepared for delivery at recruitment meetings suggest that, while Continental solicited correspondent participation in the program,[24] it was aware that interest rates could not be discussed:

> Because of antitrust implications, we are advised by counsel that we cannot attend meetings where our competitors are present and at which discounts, [prices, scratched out] terms, and conditions are discussed.

Indeed, Continental sent correspondents a summary of various ways of engaging in the charge card business without participation in the Town and Country program. In light of Continental's sworn denial and the total absence of affirmative evidence to support the vertical conspiracy allegations, plaintiffs' arguments regarding opportunity to conspire are insufficient to bar summary judgment.

 The dissemination of interest information to the correspondent banks does not constitute a "plus factor." The evidence shows that Continental distributed interest rate information only to those correspon-

---

**24.** Plaintiffs do not allege that the correspondent participation itself offers any basis for inferring the existence of conspiracy nor does the court perceive any reason to suppose that Continental's correspondent relationships pose

any antitrust problem. *Cf. United States v. Citizens and Southern National Bank,* 372 F.Supp. 616 (N.D.Ga.1974), *aff'd,* 422 U.S. 86, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975).

dents solicited to participate in the Town and Country program. And plaintiffs do not dispute the fact that Continental had a right to determine the interest rate charged customers who received Town and Country cards from the various participating correspondents because Continental, and not the correspondent, extended credit to the customer. The evidence shows that Continental unilaterally determined the interest rate to be charged Town and Country cardholders. There is no affirmative evidence suggesting that the distribution of interest rate information to participating correspondent banks ever rose to an exchange of views on that subject. Under these circumstances, the fact that the rate to be charged by participating correspondent banks was communicated to them by Continental cannot give rise to any inference of conspiracy.

Finally, plaintiffs suggest that the court should disbelieve Tingleff's affidavit on the ground that, as a Continental officer deeply involved in the Town and Country program, he is not a credible person. This argument is clearly insufficient to bar summary judgment, since if. the most plaintiffs can hope for is to discredit Tingleff's denials at trial, no issue of material fact is presented. *Modern Home Institute, Inc. v. Hartford Acc. & Ind. Co.,* 513 F.2d at 110. "Facing the sworn denial of the existence of conspiracy, it was up to plaintiff[s] to produce significant probative evidence by affidavit or deposition that conspiracy existed if summary judgment was to be avoided." *Lamb's Patio Theatre v. Universal Film Exchanges,* 582 F.2d at 1070. In the eight years since this suit was commenced, plaintiffs have not uncovered any such evidence, and none has been offered to oppose this motion. Under these circumstances, Continental's motion for summary judgment as to the charges of vertical conspiracy must be granted.

### III.

For these reasons, the motions of defendants Harris and American for summary judgment as to the charges of horizontal conspiracy among the named defendants in Counts I through IV of the third amended complaint are granted. The motion by defendant Continental for summary judgment as to the charges of horizontal conspiracy with other named defendants in Counts I–IV and of vertical conspiracy between itself and its correspondent banks in Counts III and IV is also granted. As to the Continental Illinois National Bank and Trust Company of Chicago and the American National Bank and Trust Company of Chicago, this suit is dismissed.

So ordered.

### Appendix
### DESCRIPTION OF THE COMPATIBLE BANK CHARGE CARD SYSTEM

This lawsuit involves what is known as a compatible bank charge card system. In such a system, a card issued by one bank can be used for purchases at merchants who have a contract with another bank. The members of a compatible bank charge card system operate under rules, called operating regulations.

### The Card-Issuing Bank and the Cardholder

A bank which issues bank charge cards is called a "card-issuing bank". A card-issuing bank provides a person who is called "cardholder" with a plastic charge card. The cardholder enters into a contract with a card-issuing bank which requires the cardholder to pay his bank for the money advanced by the bank for the purchases which the cardholder makes with his charge card, plus a finance or interest charge if payment is deferred beyond a specified number of days. The cardholder can, therefore, use his bank charge card to make a purchase from a merchant who accepts that charge card. The cardholder signs a charge ticket and receives a statement from his card-issuing bank on a monthly basis. If the cardholder pays the full amount specified in the statement within a stated period, no finance or interest charge is assessed. If he defers payment beyond such a period, his card-issuing bank charges him a finance charge on the unpaid balance. The cardholder can

also use his bank charge card to obtain cash from any bank in the compatible bank charge card system. The amount received by the cardholder, called a "cash advance," must also be repaid with a finance charge by the cardholder under his agreement with his card-issuing bank, and such amounts appear on the statement the cardholder receives from his card-issuing bank.

#### The Merchant and the Merchant's Bank

The merchant accepts a bank charge card instead of cash from the purchaser. At the time of such a purchase, the merchant requires the cardholder to sign a charge ticket, which the merchant then forwards to his own bank, here called a "merchant's bank", for credit to the merchant's account. The merchant's bank credits the merchant's account for the full amount of the charge ticket. For services rendered, the merchant's bank charges the merchant a fee, called the "merchant discount". The merchant's bank then forwards the charge ticket to the cardholder's own card-issuing bank sometimes directly and sometimes indirectly through another bank (the latter method is known as "interchange"). The card-issuing bank issues a credit to the merchant's bank and sends a statement to the cardholder listing this and other charge purchases he has made within a specified period.

In a compatible charge card system, procedures and rules are developed to regulate the interchange of charge card tickets and the payments among the card-issuing banks. The defendant banks (other than American) established such a system. American became a member of the system in 1969. Thus, for example, a bank charge card issued by defendant Continental can be used by the Continental cardholder at stores whose merchant bank is Harris Bank and vice versa. Said defendant banks originally operated under the procedures and rules of Midwest Bank Card System, Inc. ("MBC"). In 1969, MBC joined the Interbank Card Association, Inc. ("Interbank") which used the trademark "Master Charge". At that time, defendants adopted additional procedures and rules of Inter-

bank. Interbank or "Master Charge" cards can be used by cardholders at any merchant who accepts such cards.

(Excerpt from Agreed Pretrial Order)